## CLEWS *v.* JAMIESON.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

No. 245. Argued April 17, 18, 1901.—Decided May 27, 1901.

As the governing committee of the stock exchange had no personal interest in the fund in question in this suit, which was placed in its possession in the trust and confidence that it would see that the purposes of the deposit were fulfilled, and that the moneys were paid out only in accordance with the terms of the trust under which it was deposited, there can be no question that the fund became thereby a trust fund in the possession of the governing committee, and the disposition of which, in accordance with the trust, they were called upon to secure. The committee occupied, from the time of the deposit of the funds, a fiduciary relation towards the parties depositing it, and became a trustee of the fund, charged with the duty of seeing that it was applied in conformity with the provisions creating it.

The jurisdiction of the court below was plainly established, because, under the circumstances, the complainant had no adequate and full remedy at law.

It plainly appears in this case from the pleadings that the sales and purchases of stock were in fact made subject to the rules of the stock exchange, and all the transactions regarding the sales and purchases must be regarded as having taken place with direct reference and subject to those rules.

A principal can adopt and ratify an unauthorized act of his agent, who in fact is assuming to act in his behalf, although not disclosing his agency to others, and when it is so ratified, it is as if the principal had given an original authority to that effect, and the ratification relates back to the time of the act which is ratified.

A contract which is, on its face one of sale, with a provision for future delivery is valid, and the burden of proving that it is invalid, as being a cover for the settlement of differences, rests with the party making the assertion.

There is nothing in these contracts which shows that they were gaming contracts, and in violation of the statutes of Illinois; and there is no evidence that they were entered into pursuant to any understanding whatever that they should be fulfilled by payments of the difference between the contract and the market price at the time set for delivery.

The sales were made subject to the rules of the exchange, but those rules do not assume to exclude the jurisdiction of the courts, or to provide an exclusive remedy which the parties must follow.

The complainants were justified in the course which they pursued, and the price at which the stock sold was a fair basis upon which to determine the amount of damages.

THE petitioners and complainants, being residents of the State and city of New York, commenced this suit in equity in the United States Circuit Court for the Northern District of Illinois against certain of the defendants composing the governing committee of the Chicago Stock Exchange, to recover funds deposited with them, in trust, and also to recover damages against other defendants composing the firm of Jamieson & Company, brokers belonging to the exchange, alleged to have been sustained by the complainants by a violation by those defendants of their contract to purchase and pay for certain stock sold them by the complainants. Still other defendants composed the firm of Schwartz & Company, the brokers who effected the sales of the stock for the complainants, no recovery being sought against them. All of the defendants were residents of the State of Illinois. The Circuit Court after a hearing gave judgment for a dismissal of the bill for want of any privity of contract between complainants and defendants, Jamieson &

Company, against whom a money recovery was sought. On appeal the Circuit Court of Appeals for the Seventh Circuit affirmed the judgment of dismissal, and in the opinion discussed only the question whether or not the contract sued on was a gaming one and in violation of the statute of Illinois on that subject, sections 130 and 131 of the Criminal Code hereinafter set forth. It held that the contract violated those sections and that the bill was properly dismissed for want of equity, and it therefore affirmed the decree of dismissal. The complainants thereupon petitioned this court for a writ of certiorari, which was granted, and the case brought here.

No important question arises upon the pleadings, with the exception that it was set up by way of defence that the complainants had an adequate remedy at law, and the facts upon which the defence is rested are sufficiently adverted to in the opinion. The pleadings admit that the sales and purchases of stock were all made subject to the rules of the exchange. The case was referred to a master to take testimony and to report the same to the court with his conclusions thereon, and it was subsequently brought to a hearing upon the master's report and the testimony taken before him and upon a stipulation as to facts, entered into between the parties. The facts reported by the master are, among others, the following:

There has existed in the city of Chicago since the year 1882 a voluntary association known as the Chicago Stock Exchange, composed of brokers having places of business in the vicinity of the exchange, and who are elected to membership therein in accordance with the provisions of the constitution and by-laws; the association is governed by a governing committee composed of the president of the exchange *ex officio*, and twenty-four members, and every member is required to sign the constitution and by-laws, or assent thereto in writing, and obligate himself to abide thereby and by the rules theretofore or thereafter to be adopted.

Article 17 of the constitution provides as follows:

" SEC. 1. No fictitious sales shall be made. Any member contravening this section shall, upon conviction, be suspended by the governing committee.

" Sec. 2. Any member who shall make fictitious or trifling bids or offers or who shall offer to buy or sell any stock or security other than government bonds at a less variation than one eighth of one per cent shall, upon conviction, be subject to suspension, or such other penalty as the governing committee shall impose."

Article 29 is as follows:

. " Any member of this exchange who is interested in or associated with, or whose office is connected directly or indirectly by wire or other method or contrivance, with any organization, firm or individual engaged in the business of dealing in differences or quotations on the fluctuations in the market price of any commodity or security without a *bona fide* purchase or sale of said commodity or security in a regular market or exchange, shall, on conviction thereof, be deemed to have committed an act or acts detrimental to the interest and welfare of the exchange."

Articles 16 and 17 of the by-laws read as follows:

" ARTICLE XVI.

" Sec. 1. In any contract either party may call at any time during the continuance of the same for a deposit of ten dollars per share upon the par value of the securities bought and sold; and whenever the market price of the securities shall change so as to reduce the margin of said deposit, either way below the ten dollars, either party may call for a deposit sufficient to restore the margin to ten dollars, and this may be repeated as often as the margin may be so reduced. In all cases where deposits are called they shall be made within one banking hour from the time of such call.

· " Sec. 2. In case either party shall fail to comply with the · demand for a deposit in accordance with the provisions of this article, the party calling, after having given due notice, may report the default to an·officer of the exchange, who shall repurchase or resell the security forthwith in the exchange, and any difference that may accrue shall be paid over to the party entitled thereto. The notice above referred to shall be either personal or shall be left in writing at the office of the party to

be notified, or in case he has no office, then by public announce-ment whenever the exchange may be in session.

\*     \*     \*     \*     \*     \*     \*     \*

" ARTICLE XVII.

" Should any member neglect to fulfill his contract on the day it becomes due, the party or parties contracting with him shall, after giving notice as required by section 2 of the pre-ceding article, employ an officer of the board to close the same forthwith in the exchange by purchase or sale as the case may require, unless the price of settlement has been agreed upon by the contracting parties. In case of a failure of a creditor to close the contract as above, the price shall be fixed by the price current at the time such contract ought to have been closed under the rule. In all cases where an officer may be directed to buy or sell securities under this rule, the name of the member defaulting, as well as that of the member giving the order, shall be announced. No order for the purchase or sale of se-curities under this rule shall be executed unless made out in writing over the signature of the party giving the order, who shall state the reason therefor; and it shall be the duty of the officer who executes the order to indorse thereon the name of the purchaser or seller, the price and the hour at which the contract is closed, and hand the same to the secretary of the board, who shall within twenty-four hours ascertain whether the party for whose account the order was given has paid the difference, if any, arising from the transaction; if not, the sec-retary shall report the default to the president. The duty devolved upon the officers of the exchange under this rule shall be performed without charge. No party shall be permitted to supply offers to buy or sell securities closed for his account under the rule; and when a contract is closed under this rule, any action of the defaulter, direct or indirect, by which the prompt fulfillment of such contract is delayed, hindered or evaded, to the detriment of the other contracting party, shall subject the offending party to suspension for not less than thirty days in the discretion of the governing committee, by a vote of two thirds of the members present at the meeting.

When contracts are closed out under the rule, any member supplying the bid or offer, and not duly receiving or delivering the stock, as the case may be, renders himself liable to prosecution under this article. Should any stock thus sold not be delivered until the next day, the contract shall continue, but the defaulting party shall not be liable to pay such damage as may be assessed by the arbitration committee. The same rules as to notice, time and places that govern defaults in other contracts shall apply to borrowed securities, which on non-delivery or receipt, must be borrowed or loaned in open market, except in case of actual default in receiving or delivering after notice to close the loan; then the same are to be bought or sold, as the case may be, for account of the defaulter in the manner provided in this article."

. The rules of the clearing house in regard to buying or selling for "the account" (under which these transactions were had) read as follows :

### "Clearing House Rules.

"Sec. 1. Under the following regulations transactions may be made for 'the account' in any securities listed for that purpose dealt in at the exchange.

"Sec. 2. Deliveries of cash, stock or transactions for 'the account' shall be made on the last day of each month. Provided, however, should the last day of any month occur on a holiday, or on a day when the exchange is closed for business, then in that case deliveries shall be made on the first business day preceding.

"Sec. 3. All purchases and sales 'for the account' shall be entered upon the blanks furnished by the manager sealed for that purpose, and said blanks properly filled out, balanced, accompanied by a proof-sheet, and signed, must be delivered to said manager before 9 : 45 A. M. It shall be the duty of the manager to compare and examine the statements rendered, and to report, should any errors be found, to the parties making such errors before 12 M., by written notice, which must be called for at the manager's office. Parties in error must at once proceed to adjust the same and correct their statements. All balances

due from members as shown by the statements shall be paid by certified check drawn to the order of the bank designed for that purpose, and delivered to the manager before 10:15 A. M., the same day, except on Saturdays, when the balance must be paid before 9:45 A. M.

" Sec. 4. On balances due to members, as shown by the statements, a draft for the amount, payable to their own order, shall be drawn upon the bank designated for that purpose, and delivered to the manager before 10:20 A. M. (except on Saturday). The manager shall cause said draft, if correct, to be accepted by said bank and returned to the parties entitled thereto at the manager's office.

" Sec. 5. At or before 9:45 A. M. parties who have not borrowed or loaned their stock balances for 'the account' shall extend said balances on their statements at the closing bid price, designated as short or long, and shall request the manager, in writing, to borrow or loan said stock balances for their account and risk at the closing bid price. Notice that such loans have been made and the names of the parties thereto will be delivered at the manager's office on or before 2 P. M. Loans made by the manager are for one day only, unless renewed between members.

" Sec. 6. Stock balances as shown by the statements rendered for cash settling days must be delivered and paid for at the closing bid price of the previous day, as per manager's notices, before 1:30 P. M. Provided, however, if satisfactory evidence is shown the clearing house committee that the cash stock is on hand in New York or in transit for Chicago, three days' grace will be given the seller to make the delivery with interest, failing in which the clearing house committee shall cause to be purchased for account of delinquent said stock in whichever market in their judgment seems best; and the party so failing to deliver shall be held responsible for all loss or damage arising therefrom, but when a failure to receive or deliver occurs, nothing in these notifications shall be construed to relieve the last contracting parties to the transaction from the liabilities to each other.

" Sec. 7. Whenever a member fails to pay the balance due on his statement by 10:15 A. M. (except on Saturday), the man-

ager shall notify the presiding officer of the exchange, whose duty it shall be to forthwith cause the stock balance, as shown by the statement of the delinquent, to be bought in or sold out under the rules, as the case may be, and assess the party in interest on the statement *pro rata*.  In case any member owes an additional amount caused by errors, disputes or assessments, said amount shall be paid within one hour from the time of notification of the same, otherwise the party will be considered as having failed, and be treated accordingly.

"SEC. 8. Whenever a member is unable to meet his contracts or transactions made for ' the account,' he shall make a statement of his transactions, to be audited that day, and deliver it to the manager or presiding officer of the exchange.

"SEC. 9. The manager or any assistants employed by him in the manager's office are positively prohibited from receiving any securities or currency or any other evidences of value, except the checks and drafts hereinbefore mentioned in these rules.

"SEC. 10. The same rules as to notice, time and place that govern defaults in other contracts shall apply to transactions for ' the account.'

"SEC. 11. Neither the exchange nor any of its members (except those making the errors), the manager or any assistants employed by him, shall be responsible for any errors made in the statements to the manager, but the errors must be settled and adjusted at once between the members making said errors when notified by the manager to do so.  The manager shall report any neglect or refusal to comply with these rules to the presiding officer of the exchange.

"SEC. 12. The margin to be deposited on stocks trading in clearing house, selling at $100 or over per share, shall be $10 per share, and on all stocks selling under $100 per share, the margin shall be $5 per share.

"SEC. 13. Margins deposited on trades in the clearing house shall be considered as a margin or as a part of same under section 1 of article XVI of the by-laws of the stock exchange. All such margins to be deposited in the clearing house.

"SEC. 14. The clearing of trades and money is not completed

until the trades and substitutions are all made and notice posted to that effect by the manager of the clearing house.

" SEC. 15. The brokers [shall] have the party they may trade with or party received from the clearing house on the substitution of the day before, in case of any failures between the hours the sheets are put in the clearing house, 9 : 45 A. M., and the time the notice is posted that the substitutions are ready for that day.

" SEC. 16. In the event of the announcement of the failure of any member to meet his contract, all stock bought in, on or sold out for him as ' account ' stock shall be settled outside of the clearing house, and only such stocks as appear on the substitution sheet of the day of the failure shall be allowed to clear on the clearing house sheet of the following morning.

" SEC. 17. When any member fails to execute any contracts required of him by the clearing house, the margin checks deposited by such member for the protection of other members contracting with him through the clearing house, shall be held first for that special purpose, and after satisfying the claims of such members to the extent of the margin rule of the clearing house, the balance, if any, shall be held for a period not exceeding ten days, as a trust fund for a *pro rata* distribution among other creditors, who are members of the Chicago Stock Exchange."

The master further reported the facts relating to the sales in dispute as follows :

" That such rules and by-laws being in force, complainants, on the 16th day of July, 1896, wired their brokers, Schwartz, Dupee & Company, as follows :

" ' Sell 500 Diamond Match at $220\frac{1}{2}$ for account ; ' which was done ; that later on the same day said brokers wired complainants as follows :

" ' Sold 500 Diamond Match at $221\frac{1}{8}$ for the account.'

" That on the 20th day of July, 1896, said brokers received telegram from complainants as follows :

" ' Sell 200 Diamond Match at 221 for the account at opening of market.'

" That later on the same day said brokers wired complainants as follows :

" 'Sold 200 Diamond Match at 221½ for the account.'

" That on the 25th day of July, 1896, complainants wired said brokers as follows:

" ' Change the Diamond Match over to August account at 2½%.  If you cannot do it let us know at once.'

" That shortly after on the same day complainants wired said brokers as follows:

" ' You sent us the difference this morning at 2½ ; at what difference can you do it now ? '

" That later on the same day complainants wired said brokers as follows : ·

" ' Change the 500 at 2 cents or better.'

" That afterwards, and about 12 o'clock on the same day, said brokers wired complainants as follows:

" ' Bought Diamond Match 227 for the account ; sold 500, 229 account 2d.'

" That on July 27th complainants wired said brokers as follows :

" ' Change 200 more Diamond Match 2% or better.'

" Later on the same day said brokers wired complainants as follows :

" ' We changed the 200 Match at 2¼ difference.  Will give you price later.'

" And shortly afterwards on the same day said brokers wired complainants as follows :

" ' Bought 200 Match 226¾, account ; sold 200 second account 229.'

" That these purchases on July account balanced the sales on July account and left the brokers with sales made for complainants of 700 shares of the stock of the Diamond Match Company for the August account; that on the 3d day of August the clearing department of said stock exchange sent to Schwartz, Dupee & Company, and Jamieson & Company, clearing house sheets as follows."

Here follow copies of the sheets; that of Schwartz & Company showed that all trades on their sheet had been settled, with the exceptions therein stated, among which were 1150 shares of Diamond Match Company's stock at $222, for which

Jamieson & Company had been substituted as buyers; the notice to Jamieson & Company from the clearing department contained a like statement, showing that Jamieson & Company had bought 1150 shares of Diamond Match stock at $222, Schwartz & Company being substituted as sellers.

The 1150 shares of Diamond Match stock at $222 were made up in part of 700 shares sold by Schwartz & Company upon August account for the complainants, and the substitution of Jamieson & Company for the parties to whom such 700 shares had been originally sold was made by the clearing department of said stock exchange according to its uniform custom.

The master also found that Jamieson & Company had settled with Schwartz & Company for 450 shares of the 1150 shares referred to between those parties on the clearing house sheet of August 3, 1896, but that such settlement did not include the 700 shares in question in this case.

The master further found as to the manner of making sales " for the account : "

" That the method of doing business on said exchange is as follows: At ten o'clock there is an official call at which the secretary and manager call all the stocks, bonds and securities on the official printed list, and as this call progresses, any member wishing to buy or sell, bids thereon, and the record is made of the transaction; after which there is an irregular call, which closes at half-past one, when the manager of the clearing house announces the clearing house or settlement price for the day, which are the closing prices on the exchange for the respective stocks and securities ; that the manager then substitutes trades and sends out cards to all buying or selling on account for the current month, or for the next month; that on the 25th of the month and thereafter until the second day before the end of the month, two calls are made, one for the current month and one for the next ensuing month, and this is done to allow those who wish to do so to change their accounts over to the next month.   That this substitution was made by the clearing department by a system somewhat similar to that employed by the clearing house for banks, that is, that where a broker has

purchased and sold during the day the same amount of the same kind of stocks or bonds, his account is balanced by the clearing department, and all margins deposited by such broker may be withdrawn; that when sales and purchases are made by different brokers, one buying and the other selling, the same kind of stocks or bonds, a substitution is made by the manager of the clearing department, by which it appears that the broker selling has sold such stock, not to the person to whom it was originally sold, but to a person or persons other than those to whom such sales were originally made, and who originally bought of some one else, and that a broker purchasing stock has purchased from some broker other than the broker from whom he originally purchased the same; for instance, if A had sold 100 shares of stock to X, and B has bought the same amount of the same stock from Y, and X and Y's accounts are balanced by other transactions, the substitution would make it appear that A had sold 100 shares to B, and B had bought 100 shares from A, and the names of the parties with whom the original transactions had actually been made by A and B would not appear on the clearing house sheet; that in the transactions on said exchange it is then customary for the parties thus substituted and brought into the relation of buyer and seller with each other by the manager, to assent to the new relations thus formed, and to confirm the transactions as thus adjusted by the manager, and to put up the margins required by the rules, unless margins are already on deposit in the exchange, in which cases they are transferred by the manager to the new account.

"IV. That being advised of the substitution on account, as aforesaid, said Schwartz, Dupee & Company, and said Jamieson & Company on said 3d day of August, 1896, exchanged trading cards with each other, on which appears the following:

"'CHICAGO, Aug. 3, 1896.

"'M. Jamieson & Co.:

"'We hereby confirm sales made by us for the account to-day under the rules of the Chicago Stock Exchange, also substitution trades.

| Am't. | Kind of property. | Price. |
|---|---|---|
| | Substitution trades—Sold. | |
| 1150 | Match | 222 |
| | Difference { Collect / Pay | 287 50 |

(Signed)  " 'SCHWARTZ, B. & Co.'

" 'CHICAGO, Aug. 3, 1896.

" 'M. Schwartz :

" ' We hereby confirm purchases made by us for the account to-day, under the rules of the Chicago Stock Exchange, also substitution trades.

| Am't. | Kind of property. | Price. |
|---|---|---|
| | Substitution trades—Bought. | |
| 1150 | D. Match | 222 |
| | Difference { Collect / Pay | 287 50 |

(Signed)  " 'JAMIESON & Co.'

" That these cards were handed by the parties receiving them to the clearing house department, so that it appeared at the close of business on said 3d day of August, by the clearing sheet, that Schwartz, Dupee & Company had sold to Jamieson & Company on account, for August, 1150 shares of the stock of the Diamond Match Company, 700 shares of which are the stock in controversy in this case, delivery of which under rule 2 of the clearing house was to be made on the last day of August, 1896; that Schwartz, Dupee & Company and Jamieson & Company each deposited with the said clearing house, seven thousand dollars, as margins on said 700 shares of stock, which amount is still held by the said stock exchange, in trust.

" V. That on the 3d day of August, 1896, the governing committee, of which defendant Jamieson was then *ex officio* president, by virtue of his being then president of said exchange, held a meeting at which the following resolution was adopted, the said defendant Jamieson voting in favor of its adoption :

" ' *Resolved*, That the exchange adjourn on Tuesday morning, the 4th instant, and remain closed pending further action by this committee.'

" That pursuant to said action, said exchange did not open

on said August 4, or thereafter, until the 5th day of November, 1896.

"VI. That on the 31st day of August, 1896, Schwartz, Dupee & Company tendered to Jamieson & Company ten certificates of the stock of the Diamond Match Company for one hundred shares each, and three like certificates 50 shares each, making 1150 shares of said stock, which said Jamieson & Company examined and refused to receive."

On September 9, 1896, Schwartz & Company wrote the following letter to Jamieson & Company:

"CHICAGO, September 9, 1896.

"Messrs. Jamieson & Co., No. 187 Dearborn street, Chicago, Illinois.

"Dear Sirs: On August 31, 1896, we tendered you seven hundred (700) shares of Diamond Match stock in settlement of sales made by us. The sales made were 500 shares July 25th, and 200 shares July 27th, 1896, you being substituted through the clearing house of the Chicago Stock Exchange August 3, 1896, as the purchaser of the said stock.

"This is to notify you that said sales were made by us as agents for Henry Clews & Co. of New York, who may rightfully take any proceedings to enforce the contracts for said sales and who are authorized to make settlements therefor.

"Very truly yours,

"SCHWARTZ, DUPEE & Co."

(This tender of the 700 shares was part of the total tender made to Jamieson & Company on the 1150 shares sold them.)

The complainants on the next day (the 10th of September) gave Jamieson & Company notice in writing of their intention to sell 700 shares of Diamond Match Company stock, at public sale, to the highest bidder, and named the place and time, and that they would hold Jamieson & Company responsible for any loss on the sale on account of the contracts.

It was further admitted "that Schwartz, Dupee & Company have no claim whatever of any kind or character against the fourteen thousand dollars, seven thousand dollars of which was respectively contributed by Schwartz, Dupee & Company and

Jamieson & Company to the clearing house of the Chicago Stock Exchange." And it was testified that the $7000 deposited by Schwartz & Company were for the account of complainants, in whom is the real interest in such fund.

The stipulation as to facts signed by the parties for the purpose of the trial contained long and detailed statements of the actions of Jamieson & Company and Schwartz & Company in relation to all purchases and sales by them of Diamond Match Company's stock, for both July and August accounts, whether between themselves directly or not, and the stipulation ended with this statement:

"That the transactions heretobefore set out in this stipulation of purchase and sale of Schwartz, Dupee & Company, Jamieson & Company and the other brokers whose names are stated, with the exception of those transactions which are marked as substitutions, were had by the brokers on behalf of different clients or principals whom they represented, and those transactions, so far as the different principals are concerned, were not settled or canceled by any of the substitutions, nor by any of the settlements between the brokers, except so far as where one client or principal of a broker was, through such broker, both a purchaser and a seller.

"In other words, the settlements by substitutions or otherwise through the clearing house were merely settlements between the members of the stock exchange, and were not settlements or cancellations of the contracts between the principals whom the brokers represented and the brokers themselves, except where the same broker had both purchased and sold for the same client."

It was also admitted that when complainants gave their orders to sell and at the time that they were executed by Schwartz & Company the latter did not have in their hands any stock of the Diamond Match Company belonging to the complainants, nor did Schwartz & Company at any time thereafter have in their hands any of the stock of that company, which was the property of the complainants; that the 1150 shares of capital stock of the Diamond Match Company tendered to Jamieson & Company by Schwartz & Company in behalf of complain-

ants, on August 31, 1896, were not the property of the complainants, nor any part thereof; that the 700 shares of stock alleged to have been sold in the bill of complaint, on September 22, 1896, were not delivered to the alleged purchaser after the sale, but were delivered to J. W. Conley, a member of the firm of Schwartz & Company by the individual who conducted the sale on behalf of the complainants, for safekeeping by Conley. The stock tendered belonged to Schwartz & Company, who tendered it on behalf and for the benefit of complainants.

The various facts set forth in the stipulation form a somewhat complicated mass of detail, and, when taken in connection with the oral evidence and the findings of the master, it is not clear that they are all perfectly consistent.

Upon the hearing before the master, Mr. Joseph R. Wilkins, the secretary and chairman of the Chicago Stock Exchange and manager of the clearing house, was called as a witness in behalf of the complainants. After giving a statement of the manner in which business was done on the exchange in relation to sales for " the account," he testified that the expressions in the telegrams from the complainants to the brokers, in which the word " difference " occurred, did not mean the difference between the then market price of the stock and the contract price, but meant the charges made for carrying the stock for the customer until the next delivery day. The price for this service differs from day to day, and is matter of agreement for each transaction; it is in effect the interest charged by the individual who carries the stock, on the amount necessary to carry it until the next delivery day. The rate of interest differs, of course, according to the demand, and is matter of agreement between the parties. The charge bears no relation whatever to the difference between the market price and the contract price of the stock. He also testified that a sale for " the account " on any day up to the 25th of the month means a sale of the stock which has to be delivered and paid for and taken at the end of the month. In other words, an actual delivery of the stock is contemplated by such a contract, and if a change from that delivery day to the next delivery day, thirty days thereafter, is asked for, it will depend upon the agreement of the parties upon what

terms it shall be made.   He also said that a sale for "the account" under the rules of the exchange assumed that there might be changes or substitutions of names during the period between the sale and the delivery day, and this happened by reason of the clearing house custom, under which all the sheets showing the transactions of the brokers in the sales and purchases in a given stock during the day were examined in the clearing house and the sheets balanced, so that at the end it appears there are a certain number of shares sold and the same number bought, and if the sheets do not balance the work stops and does not go on until a balance is made.   After the balance is arrived at the substitution of names takes place, and the tickets or cards are sent to the brokers who are "long" and "short" of the stock respectively, and they then send to each other cards confirming the sale each day, and the cash deposit with the committee is added to by the one side and taken from by the other, according to the fluctuation of the stock, so that the full amount of deposit is kept at all times with the committee until the transaction is closed.

In regard to the fluctuations of price from day to day and the manner in which a party selling or buying at a certain price finally obtains or pays it on delivery day, although the original purchaser may have substituted another name at a different price, the witness explained that such original price was realized by means of the margin in the hands of the committee, which was added to daily by the party against whom the price of the stock turned, and drawn from by the party in whose favor it turned, so that, taking such payments and adding the price the stock actually sold for on the delivery day, the party selling or purchasing obtains his original selling or purchase price, which results in a loss or a gain, as the price of the stock on delivery day is higher or lower than the original contract price.

*Mr. Henry D. Estabrook* for petitioners.   *Mr. Frank O. Lowden* and *Mr. Herbert J. Davis* were on his brief.

*Mr. John H. Hamline* and *Mr. Horace Kent Tenney* for

respondents. *Mr. Frank H. Scott* and *Mr. Frank E. Lord* were on *Mr. Hamline's* brief. *Mr. Samuel P. McConnell, Mr. M. Lester Coffeen, Mr. Charles F. Harding* and *Mr. James H. Wilkerson* were on *Mr. Tenney's* brief.

MR. JUSTICE PECKHAM, after making the above statement of facts, delivered the opinion of the court.

It is contended that there is an adequate and complete remedy at law for any liability that may arise by reason of the transactions above set forth, and that therefore the bill was properly dismissed and the decree of dismissal should be affirmed by this court.

It is undisputed that the defendants, the governing committee of the stock exchange, have in their hands the sum of $14,000, the absolute title to which they do not claim. That sum was deposited with them by Schwartz & Company and Jamieson & Company, each depositing one half, for the purpose of thereby securing the performance of the contract entered into by those parties, and which sum was only to be taken from the possession of the governing committee for the purpose of fulfilling the condition upon which its deposit with the committee was made. As that committee had no personal interest in or title to the fund and it was placed in its possession in the trust and confidence that it would see that the purposes of the deposit were fulfilled and the moneys paid out only in accordance with the terms of the trust under which it was deposited, there can be no question that the fund thereby became a trust fund in the possession of the governing committee and the disposition of which in accordance with the trust those members were called upon to secure. The complainants claim that pursuant to the conditions of the trust they are entitled to the money deposited with the committee. It is shown that the money deposited by Schwartz & Company was deposited by them for and in behalf of the complainants, and Schwartz & Company lay no claim to the fund or any portion of it. Complainants demanded from the committee the payment of the whole fund to them on the ground that they were entitled to such payment

by the terms of the trust, and because of the violation of the contract by Jamieson & Company, to secure which the latter deposited $7000 of the fund in question. The committee has refused to pay over any portion of this fund to complainants, although it lays no claim to it, or any portion of it, on its own behalf. There is a dispute in regard to the right of the complainants to any portion of this fund, and a refusal on the part of the committee to pay it over to them. By reason of the facts, the committee occupied, from the time of the deposit of the funds, a fiduciary relation towards the parties depositing it, and it became a trustee of the fund charged with the duty of seeing that it was applied in conformity with the provisions creating it.

Pomeroy in his work on Equity Jurisprudence, second edition, instances, among other equitable estates and interests which come within the jurisdiction of a court of equity, those of trusts. In volume one, at section 151, he says: "The whole system fell within the exclusive jurisdiction of chancery; the doctrine of trusts became and continues to be the most efficient instrument in the hands of a chancellor for maintaining justice, good faith, and good conscience; and it has been extended so as to embrace not only lands, but chattels, funds of every kind, things in action, and moneys."

All possible trusts, whether express or implied, are within the jurisdiction of the chancellor. In this case the committee, as trustee, was charged with the performance of some active and substantial duty in respect to the management and payment of the funds in its hands, and it was its duty to see that the objects of its creation were properly accomplished. The fact that the relief demanded is a recovery of money only is not important in deciding the question as to the jurisdiction of equity. The remedies which such a court may give "depend upon the nature and object of the trust; sometimes they are specific in their character, and of a kind which the law courts cannot administer, but often they are of the same general kind as those obtained in legal actions, being mere recoveries of money. A court of equity will always, by its decree, declare the rights, interest or estate of the *cestui que trust,* and will compel the

trustee to do all the specific acts required of him by the terms of the trust. It often happens that the *final* relief, to be obtained by the *cestui que trust* consists in the recovery of money. This remedy the courts of equity will always decree when necessary, whether it is confined to the payment of a single specific sum, or involves an accounting by the trustee for all that he has done in pursuance of the trust, and a distribution of the trust moneys among all the beneficiaries who are entitled to share therein." 1 Pom. Eq. Jur. sec. 158.

In cases where the equity doctrine of trusts has been extended so as to embrace other relations of a fiduciary kind, while it may not be said that a court of equity possesses exclusive jurisdiction, yet it is well settled that in such case there is so much of the trust character between the parties so situated that the jurisdiction of equity, though not exclusive, is acknowledged. 1 Pom. Eq. Jur. sec. 157.

In *Foley* v. *Hill*, 2 H. L. Cas. 28, a question arose over that sort of relation which exists between a banker and his depositor, and it was held to be merely that of debtor and creditor. The court added however that, as between principal and factor, an equitable jurisdiction attached, because the latter partook of the character of a trustee, and that "so it is with regard to an agent dealing with any property. . . . And though he is not a trustee according to the strict technical meaning of the word, he is *quasi* a trustee for that particular transaction," and, therefore, equity has jurisdiction.

In *Marvin* v. *Brooks*, 94 N. Y. 71, it was held that an agent who had been entrusted with his principal's money to be expended for a specific purpose might be required to account in equity, and that upon such an accounting the burden was upon him to show that his trust duties had been performed and the manner of their performance. The jurisdiction was placed upon the ground of a fiduciary or trust relation, and it was held that a court of equity had jurisdiction over trusts and those fiduciary relations which partake of that character, and in such cases the right to an accounting is well established; but it was held that the existence of a bare agency was not sufficient. It

must be an agency coupled with some distinct duty on the part of the agent in relation to funds or some specific property.

In 2 Story's Eq. Jur. (12th ed.) it is stated, at section 975*a*, that in general a trustee is suable in equity in regard to any matters touching the trust.

. In *Oelrichs* v. *Spain*, 15 Wall. 211, 228, the court remarked that there being an element of trust in the case, that element, wherever it existed, always confers jurisdiction in equity.

That the governing committee could file a bill of interpleader against the complainants and the other defendants, alleging that each claimed the fund, or some portion thereof, and ask the court to determine which of the parties was entitled to the same, furnishes no reason for excluding the jurisdiction of equity in this case.

It may be somewhat doubtful whether an action against these defendants could be maintained at law, the contract not being originally between Schwartz & Company and Jamieson & Company, but only becoming so by way of substitution under the rules of the clearing house, and the relief sought being different between the two sets of defendants, Jamieson & Company and the members of the governing committee of the stock exchange. The maintenance of this suit enables the whole question between all the parties to be determined therein, and prevents the necessity of any action at law or other proceeding in the courts for the purpose of determining the ultimate and final rights of all the parties to this suit. Such relief cannot be obtained in any one action at law.

Upon all the facts we think that the jurisdiction of the court was plainly established, because under the circumstances the complainants had no adequate and full remedy at law.

. We are then brought to the question decided by the Circuit Court, which held that there was no privity of contract between the complainants and Jamieson & Company. Aside from the general rule that a party sending an order to a broker doing business in an established market or trade for a transaction in that trade, thereby confers upon the broker authority to deal according to any well-settled usage in such trade or market, *Bibb* v. *Allen*, 149 U. S. 481, 489, it plainly appears in this case

from the pleadings that the sales and purchases of stock were in fact made subject to the rules of the exchange, the complainants alleging in their bill that such was the fact, while the defendants Jamieson & Company in their answer make a like claim.

All the transactions regarding the sales and purchases of the various shares of stock mentioned in this case must, therefore, be regarded as having taken place with direct reference and subject to those rules.

The Circuit Court did not question that upon the facts stated a contract came into existence whereby primarily Schwartz & Company were obliged to sell to Jamieson & Company 700 shares of the stock named at the price of $222 per share, and it found no difficulty in holding that the undisclosed principals of either of these parties were entitled to step into the places of these respective brokers, and in their own name and for their own benefit insist upon the enforcement of the contract according to its terms; that under the rules of the exchange each of the brokers bound himself to the other broker and the principals whom the other broker represented to carry out the terms of the contract, but the court held that the evidence disclosed that Schwartz & Company were only clothed with the authority to sell the stock at $229, and that their principals, the complainants herein, were not bound by a sale at any figure less than that sum, and that neither Schwartz & Company nor any persons with whom that firm had contracted could have compelled the complainants to deliver the stock at a price less than $229. As the fact appeared that the contract between the respective brokers was for a sale at $222, the defendants Jamieson & Company, even under the substitution provided for by the rules of the stock exchange, could not hold complainants as principals of the contract for a sale at that price, and the court held that for want of mutuality the complainants are in no position to hold those defendants; that there was no identity of contract between the one the complainants authorized and the one entered into between the brokers, and the fact that the complainants now choose to accept it is of no consequence, the legal fact remained that they are not so bound, and, not being so bound,

the defendants Jamieson & Company on their part are not legally bound.

In this case, although the brokers on the exchange acted in their own name, yet in fact each acted for undisclosed principals. In regard to 700 shares Schwartz & Company acted for the complainants, and in regard to 450 shares they acted in behalf of other clients. If the contract had been for the sale and purchase of these shares at $229, there would have been no difficulty in the case upon the principle adopted by the Circuit Court. The bar to a recovery lay in the alleged fact that the sale was without authority, although really procured by Schwartz & Company while acting as agents of the complainants.

A principal can adopt and ratify an unauthorized act of his agent who in fact is assuming to act in his behalf, although not disclosing his agency to others, and when it is so ratified it is as if the principal had given an original authority to that effect and the ratification relates back to the time of the act which is ratified. He must disavow the act of his agent within a reasonable time after the fact has come to his knowledge, or he will be deemed to have ratified it. Bringing a suit upon the contract of his agent which was unauthorized at the time and in excess of the authority conferred upon the agent is a ratification of the unauthorized act; and it is no answer to the ratification that prior to its taking place the principal is not bound, and hence there is no right on the part of the other party to enforce as against him the unauthorized act of his agent. These principles are well known, and may be found laid down in the following text books and authorities: Story on Agency, 9th ed. sec. 90, note 7; secs. 248, 251 and 251*a*, and note; secs. 258, 259; Livermore on Agency, page 44; Dunlap's Paley on Agency, 4th Am. ed. marginal page 324, note; *Lucena* v. *Craufurd*, 1 Taunton, 325, 334, 336; *Routh* v. *Thompson*, 13 East, 274, 283; *Hagedorn* v. *Oliverson*, 2 Maule & Selw. 485; *Fleckner* v. *Bank of United States*, 8 Wheat. 338, 363; *Law* v. *Cross*, 1 Black, 533, 539, citing *Hoyt* v. *Thompson*, 19 N. Y. 207, 218, 219; *Cooke* v. *Tullis*, 18 Wall. 332, 338.

Therefore if in fact the sale at $222 had been unauthorized

on the part of Schwartz & Company, the subsequent ratification of their unauthorized act by the complainants was the same as a precedent authority to them. The failure of the complainants to repudiate the action of their agents in the sale immediately after it was reported to them would operate as a ratification. They not only failed to repudiate, but actually approved the action, and notified the defendants Jamieson & Company that the sales made by Schwartz & Company to the extent of 700 shares of stock had been made for them, and that they should hold Jamieson & Company liable upon the contract and for any damage caused by its violation.

It is argued, however, on the part of complainants that there was no unauthorized action by Schwartz & Company, and in proof thereof an explanation is given and an argument made founded thereon in relation to the peculiar facts which attend the sale and purchase of stock on "the account" on the floor of the stock exchange at Chicago. The very term itself imports, as is stated and as the evidence shows, a sale of stock to be delivered at a future time, and under the rules of the exchange that time means the last day of the month in which the sale or purchase is made.

Under these same rules, when an agreement to sell for future delivery is effected, each party places a margin in the hands of the governing committee for the purpose of securing the performance of the contract, and, as is set forth in the foregoing statement of facts, this sum is kept intact in the hands of the committee until the final closing of the transaction, and upon a sale for "the account" the fluctuation in the price of the stock is provided for by payment into the fund upon the part of the one against whom the price of the stock has turned, and by drawing out of that same fund by the party in whose favor the price was, and so at the delivery day, whatever the price may be, the party selling gets the market price of the stock on that day, and the difference between that and the contract price he has received by payments into the fund in the hands of the governing committee by the other party and his withdrawal of the same sums, making in that way the contract price of the stock. Hence, it is argued, on the part of complainants that the sale

at $222 was entirely proper, and in accordance with the previous authority given complainants' agents, because the difference between $229 and $222 complainants' agents had already received by a draft drawn upon the fund in the hands of the governing committee. This is upon the assumption that there had been a margin put up by the parties to the sales on the July account in accordance with the rules, which had been carried over to the August account, and that into this deposit the money had been paid as the stock dropped from July 25 to August 3, and Schwartz & Company had drawn the same out.

If this plainly appeared in the testimony, the findings or the stipulation of the parties, it would be an answer to the contention that the act of Schwartz & Company in selling at $222 was unauthorized. It is, however, answered on the part of Jamieson & Company that there is no evidence that this fund had been drawn from and paid into by the respective parties, and hence there is no basis of fact appearing in the record upon which the argument can rest. Counsel allege that the statements on the part of the complainants are at variance with the conceded facts in the case. They say in the first place that the bill itself avers that this deposit was made when the contract of August 3 for 1150 shares, was entered into, and that the answers of the governing committee and of Jamieson & Company expressly state that the deposit was made on that day. If this fund were not created until August 3, it could not have been drawn from by the agents of complainants in the July previous, and so it would be impossible for the complainants to have received moneys from that fund prior to that date. Although the rules of the stock exchange require the deposit of these margins, and in cases where a sale for "the account" has been changed from one month to the following, the rules and the practice of the exchange require that the deposit on the old account shall be transferred to the new, yet still it is said that the rules or practice requiring such deposit cannot supply the place of evidence of a fact when the pleadings expressly state the opposite.

It seems to us quite evident, after a perusal of the whole record and from the manner in which the case was tried, that it

was assumed that a deposit of the moneys for the first July sales was made and that such deposit remained and went over into the new account of and for August delivery, although such assumed fact may be inconsistent with the allegation in the pleadings in regard to the date of the deposit, which was alleged to be August 3. There is perhaps this technical inconsistency, yet assuming it to be as claimed on the part of counsel for Jamieson & Company, it does not touch the fact that the complainants ratified the action of their agents, Schwartz & Company, in selling at $222.

Aside from these questions, however, it is claimed on the part of Jamieson & Company that the record shows there never was any privity of contract between these parties, complainants on the one side, and Jamieson & Company on the other, because there were contracts on the part of Schwartz & Company for other dealers in the same stock, and that such contracts were not closed on August 3. Their claim is, even assuming that on August 3, Schwartz & Company contracted to sell to Jamieson & Company 1150 shares of stock at $222, deliverable August 31, the record shows that the complainants were not alone the interested parties to that contract. It is averred that 700 shares of the 1150 shares sold by Schwartz & Company to Jamieson & Company, on August 3, were for the account of the complainants, but it also appears that of the 1150 shares, 450 were sold for the account of others. These latter shares have, however, been settled for between the respective brokers. We are not concerned with the terms of the settlement or any admission or liabilities resulting therefrom, but the fact of such settlement eliminates all questions in regard to those 450 shares and leaves the 700 shares remaining, which were the shares sold by Schwartz & Company as agents for the complainants. The fact that there were in this sale of August 3 other shares than the 700, and that in regard to those others some had been sold originally by Schwartz & Company to other and different brokers than Jamieson & Company, will not prevent the contract as to the 700 shares from being enforced by complainants against Jamieson & Company, although but for such settlement there might have been some embarrassment in maintaining a suit

against the latter for a portion only of the total shares sold them, while the other portion was represented by different clients of Schwartz & Company. The splitting up of the contract into two or more claims in behalf of different principals of Schwartz & Company and bringing different suits by the different principals against Jamieson & Company, on the single contract, might be in violation of the general rule refusing to recognize such right, but where all other claims have been settled and there remains but the one demand against the defendants, the objection does not apply, and we see no reason why the complainants may not take advantage of the contract made by their agents and enforce the same against Jamieson & Company.

Selling " for the account" is not an invention of the Chicago Stock Exchange. It has been practiced upon the London and the New York and other stock exchanges for many years, and the general rules governing it are much the same on all of them. Thus it is said in Dos Passos on Stock Brokers and Stock Exchanges, page 276, as follows:

" It also appears in accordance with the usages of the stock exchange that the broker may, in executing the order of a client, enter into a contract for the specific amount of stock ordered to be bought or sold, or may include such order with others he may have received in a contract for the entire quantity, or in quantities at his convenience.

" Neither in stock exchange contracts is there any real appropriation to any particular client of any particular stock in any transaction entered into with the jobber. Each transaction only forms an item in an account with that jobber, or, more correctly, with the house generally—that is to say, specific delivery or acceptance of that amount of stock is not necessarily made; but the transaction is liable to be balanced at any time during that account by a counter transaction by the same broker on behalf of the same or any client, or even on his own behalf, so that the balance only of all purchases and sales of that particular stock made by the broker in the house generally is to be finally accepted or delivered by him, and this through the instrumentality of the clearing house and the system of tickets."

The rules of the Chicago exchange clearly contemplate and provide for a substitution of names between the selling and the delivery days, and each party is kept secured by the margin originally put up, which is added to and taken from as the stock fluctuates in price from day to day. Hence it may be that the parties buying or selling may by virtue of this rule be liable to different principals represented in one original contract between the brokers. Whatever the rules or practice of the exchange may be, it is of course plain that no principal can be held to the performance of a contract which he never made, authorized or ratified. The stipulation made between the parties relating to this.matter, while not entirely plain, might affect the right to maintain this action but for the fact.that all other claims were settled, leaving only the controversy regarding the 700 shares to be disposed of between these parties. Upon the facts before us we think there was sufficient privity of contract between them to sustain this suit.

The view taken by the Circuit Court of Appeals in regard to this case was that the contracts were void as being in violation of the terms of the Illinois statute, sections 130 and 131, which are set forth in the margin.[1] It is a very far-reaching decision,

---

[1] SEC. 130. Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain or other commodity, stock of any railroad or other company, or gold, or forestalls the market by spreading false rumors to influence the price of commodities therein, or corners the market, or attempts to do so in relation to any such commodities, shall be fined not less than $10 nor more than $1000 or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void.

SEC. 131. All promises, notes, bills, bonds, covenants, contracts, agreements, judgments, mortgages, or other securities or conveyances made, given, granted, drawn or entered into, or executed by any person whatsoever, where the whole or any part of the consideration thereof shall be for any money, property or other valuable thing, won by any gaming or playing at cards, dice or other game or games, or by betting on the side or hands of any person gaming, or by wager or bet upon any race, fight, pastime, sport, lot, chance, casualty, election or unknown or contingent event whatever, or for the reimbursing or paying any money or property knowingly lent or advanced at the time or place of such play or bet, to any person or persons so gaming or betting, or that shall, during such play or betting, so play or bet, shall be null and void and of no effect.

and if followed would invalidate most transactions of every stock exchange in the country " for the account." We are unable to agree with the opinion of the court on this question.

" The generally accepted doctrine in this country is, as stated by Mr. Benjamin, that a contract for the sale of goods to be delivered at a future day is valid, even though the seller has not the goods, nor any other means of getting them than to go into the market and buy them; but such a contract is only valid when the parties really intend and agree that the goods are to be delivered by the seller and the price to be paid by the buyer; and, if under guise of such a contract, the real intent be merely to speculate in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, then the whole transaction constitutes nothing more than a wager, and is null and void."

This quotation with the doctrine therein stated is approved in *Irwin* v. *Williar*, 110 U. S. 499, 508.

As a sale for future delivery is not on its face void, but is a perfectly legal and valid contract, it must be shown by him who attacks it that it was not intended to deliver the article sold, and that nothing but the difference between the contract and the market price was to be paid by the parties to the contract. And the fact that at the time of making a contract for future delivery the party binding himself to sell has not the goods in his possession and has no means of obtaining them for delivery, otherwise than by purchasing them after the contract is made, does not invalidate the contract. *Hibblewhite* v. *Mc-Morine*, 5 M. & W. 462. Parke, Alderson and Maule, barons, before whom the case was heard, were unanimously of this opinion.

In order to invalidate a contract as a wagering one, both parties must intend that instead of the delivery of the article there shall be a mere payment of the difference between the contract and the market price. *Pearce* v. *Rice*, 142 U. S. 28; *Pickering* v. *Cease*, 79 Illinois, 328. In the latter case it was stated:

"Agreements for the future delivery of grain, or any other commodity, are not prohibited by the common law, nor by any statute of the State, nor by any policy adopted for the protection of the public. What the law does prohibit, and what is deemed detrimental to the general welfare, is speculating in differences in market values. The alleged contracts for August and September come within this definition. No grain was ever bought and paid for, nor do we think it was ever expected any would be called for, nor that any would have been delivered had demand been made. What were these but 'optional contracts,' in the most objectionable sense; that is, the seller had the privilege of delivering or not delivering, and the buyer the privilege of calling or not calling for the grain, just as they chose. On the maturity of the contracts, they were to be filled by adjusting the differences in the market values. Being in the nature of gambling transactions, the law will tolerate no such contracts."

And in *Pearce* v. *Rice*, 142 U. S. 28, 40, it was remarked:

"But the evidence before us is overwhelming to the effect that the real object of the arrangement between Hooker & Company and Foote was, not to contract for the actual delivery, in the future, of grain or other commodities—which contracts would not have been illegal (*Pickering* v. *Cease*, 79 Illinois, 328, 330)—but merely to speculate upon the rise and fall in prices, with an explicit understanding, from the outset, that the property apparently contracted for was not to be delivered, and that the transactions were to be closed only by the payment of the differences between the contract price and the market price at the time fixed for the execution of the contract."

A contract which is on its face one of sale with a provision for future delivery, being valid, the burden of proving that it is invalid, as being a mere cover for the settlement of "differences," rests with the party making the assertion. A defence of the illegality of the contract was pleaded by the defendant in *Cothran* v. *Ellis*, 125 Illinois, 496. In speaking of the burden of proof the court (at page 506) said:

"The facts alleged in the defendant's pleas, and put in issue by the plaintiff's traverse, are the only controverted facts in this

case, and the *onus probandi* was upon the defendant. If the latter had offered no evidence at all, it would not have been necessary for the plaintiff to offer any, for the jury are always bound to find the facts against the party having the burden of proof, if he offers no evidence in support of the issues."

In *Irwin* v. *Williar*, 110 U. S. 499, 507, the trial judge in substance charged the jury that the burden of showing that the parties were carrying on a wagering contract and were not engaged in legitimate trade or speculation rests upon the defendant. Contracts for the future delivery of merchandise or stock are not void, whether such property is in existence in the hands of the seller or to be subsequently acquired. On their face these transactions are legal, and the law does not, in the absence of proof, presume that the parties are gambling. The proof must show that there was a mutual understanding that the transaction was to be a mere settlement of differences; in other words, a mere wagering contract. This charge was approved by this court, and the principle was again approved in *Bibb* v. *Allen*, 149 U. S. *supra.*

Taking the contracts in this case as evidenced by the various telegrams passing between the complainants and their agents, Schwartz & Company, and having in mind the manner in which the business was in fact transacted, we are unable to find any evidence upon which to base a holding that the contracts came within the statutes of Illinois on the subject of gaming. There was no proof that there was a mutual understanding that the transactions were to be settled by a mere payment of "differences," and that there was to be no delivery, nor, in our judgment could any inference to that effect be legitimately drawn from the undisputed facts. In the first place it is proper to consider the rules of the stock exchange where the business was done. We find that article 17 of the constitution provides in section 1, "that no fictitious sale shall be made. Any member contravening this section shall upon conviction be suspended by the governing committee." Article 29 prohibits any member of the exchange from being interested in or associated with any organization engaged in the business of dealing in differences or quotations on the fluctuations in the market price of any

commodity or security, without a *bona fide* purchase or sale of said commodity or security in a regular market or exchange. These two rules provide on their face that no sale for mere collection of differences is allowed; that every sale must be one in good faith for the delivery, either present or future, of the article sold. Sales "for the account" under the rules are made upon the basis of an intended actual delivery of the stock at the time when due. The evidence upon this point is undisputed.

A contract for the mere settlement of differences is a violation of the rules of the organization under which these brokers were doing business. Neither the rules of the exchange nor those of the clearing house set forth in the foregoing statement provide for these wagering contracts. Some of them provide for the course to be pursued where a member fails to fulfill his contract. They do not provide as a means for the fulfillment of such contract the payment of "differences," but point out a course which the party claiming the fulfillment may pursue as against the party who violates the contract. Rule 17 treats the party failing to fulfill as a defaulter, and his name as a defaulter is announced. Sections 1 and 2 of article 16 provide for the failure of either party to keep up his margin, and the failure is described as a default. To say that such rules afford strong ground to infer an understanding between the parties doing business subject to them—that their contract was not one of actual sale, but merely one to speculate upon "differences" —is, in our opinion, to presume an illegal contract against its plain terms, and without any sound basis for the presumption. Thus, if an individual agreeing to purchase and pay for certain stock at a future date fails or refuses to perform his contract, the stock is sold under the rule, the price received and the difference between the price at which it sold and the contract price he is held answerable for. That would be his legal liability, in any event, and we cannot agree that the rules made for the case of a violation of contract provide or were intended to provide a means for its fulfillment. In case of a violation, the rules merely afford an expeditious means of ascertaining the amount of the damages. Of course, we do not say that these rules actually prevent gambling on the exchange. It is

possible, if not probable, that gambling may be and is in fact carried on there, but it must be in violation of and not pursuant to the rules.

Recurring, then, to the terms of these contracts, there is nothing therein which shows that they were gaming contracts, and hence in violation of the Illinois statute. They were plain directions to sell certain named stock for "the account," the meaning of which was that the stock was to be sold for actual delivery on the next delivery day, being the last day of the month. Such a direction presumes the intention to deliver the stock at the time named upon the receipt of the purchase price thereof as agreed upon at the time of the sale. There is no presumption opposed to this view in the absence of any evidence upon which it can rest. The fact that at the time of the sale the complainants did not own any of the stock cannot support the presumption, because it is perfectly valid to make such a sale, and an illegal intent accompanying the performance of a perfectly legal act cannot be presumed. The subsequent telegrams directing the changing of the delivery time from the July to the August account, after inquiring in regard to the difference upon which such change could be effected, furnish no evidence of any illegal intention in connection either with the original or the changed contracts.

The "difference," as explained by the testimony set out in the foregoing statement, related to the charges to be made for carrying the stock from the July to the August delivery day, and did not relate to the payment of any difference between the contract price and market price of the stock. A direction to change the 500 shares from the July account to the August account would mean, as Mr. Wilkins, the manager of the stock exchange, testified, that the party who had agreed to sell 500 shares of stock, deliverable in July, did not wish to deliver on that day, and the direction to change to the August account meant that the agents were to buy in that number of shares and sell them out again for the August account, keeping "short" the same amount of stock and making the difference in that case of $2.50 a share, or $250 on every 100 shares of stock, for carrying it for another month, and this charge was the interest which

the party would have to pay to him who was on the other side of the market and who would carry it to the next delivery day, 30 days thereafter.

There is nothing in the whole transaction from which it can be reasonably said that at the time when the original July order to sell was given there was any intention to do otherwise than make delivery of the stock at the July settlement day, and a delivery must have been then made by the very terms of the contract, as also under the rules of the exchange, unless there might thereafter be a change of that agreement by postponing the delivery to the August account. If there were no such subsequent agreement, then the delivery must have been made in July, but the seller might, in order to make it, enter into another agreement with some one else to take it off his hands upon such terms as might be agreed upon. There is absolutely no evidence that these contracts were entered into pursuant to any understanding whatever that they should be fulfilled by payments of the difference between the contract and the market price at the time set for delivery. To hold otherwise would entirely prevent any dealing in stocks for "the account," including of course a case where for any reason the delivery day should be changed from the one originally intended to another and a future day.

To uphold the rulings of the Circuit Court of Appeals herein the cases of *Pickering* v. *Cease*, 79 Illinois, 328; *Lyon* v. *Culbertson*, 83 Illinois, 33; *Tenney* v. *Foote*, 95 Illinois, 99; *Pearce* v. *Foote*, 113 Illinois, 228; *Cothran* v. *Ellis*, 125 Illinois, 496; *Schneider* v. *Turner*, 130 Illinois, 28, and *Soby* v. *The People*, 134 Illinois, 66, have been cited. We have examined them all, and are unable to see that they justify the ruling herein.

These cases hold these various propositions:

(1) That "option contracts" to sell or deliver grain or other commodity, or railroad or other stock, which contracts are intended to be settled by payment of differences at the settling date, are invalid. 79, 83, 113 and 125 Illinois, *supra*.

(2) A contract to have or give to himself an option to sell or buy at a future time any grain, etc., subjects the party to fine or imprisonment, and all contracts made in violation of the stat-

ute are gambling contracts and void under section 130, Criminal Code, and all notes or securities, part of the consideration of which is money, etc., won by wager upon an unknown or contingent event, as described in section 131 of the code, are also void. 95 and 113 Illinois, *supra.*

(3) An "option contract" to sell or buy at a future time grain or other commodity or stock, etc., is void under the Illinois statute, even though a settlement by differences was not contemplated. 130 Illinois, *supra.*

(4) The keeper of a shop or office where dealing is carried on in stock, etc., on margins, without any intention of delivering articles bought or sold, is guilty of an offence under the Illinois act of 1887. 134 Illinois, *supra.*

The cases of *Pearce* v. *Rice*, 142 U. S. *supra*, and *Irwin* v. *Williar*, 110 U. S. *supra*, are referred to in some of these cases as holding that dealings in differences, where the contract provides therefor, are void.

These Illinois cases, it will be seen upon examination, do not touch the case before us, which is a contract for future delivery, where there is no evidence that such delivery was not contemplated and a settlement by payment of differences only intended. The "option contracts" spoken of in those cases are explained in the cases themselves to mean what is commonly called "puts and calls," where there is no obligation on the part of the person to sell or to buy, and that class of contracts is the class covered by the statute. There is nothing in the evidence in this record that seems to us to afford any reasonable ground for holding that the contract in this case was on its face illegal as in violation of any statute in Illinois, or that, while valid on its face, the contract was really a guise under which to enable the parties to gamble on the differences in the price of stock sold and bought.

The further objection that these contracts having been made with reference to the rules of the exchange, the parties must in pursuing a remedy be confined to that which the rules provide, to the exclusion of the jurisdiction of ordinary courts of justice, we do not regard as well taken.

The sales were made subject to the rules referred to, but so

far as regards a remedy for their violation, those rules provide a means by which parties may seek and obtain relief in accordance with their terms. They do not assume to exclude the jurisdiction of the courts, or, in other words, they do not assume to provide an exclusive remedy which the parties must necessarily follow, and which they have no right to refuse to follow without violating such rules, and thereby violating their contract. Any rule which would exclude the jurisdiction of the courts over contracts or transactions such as are here shown would not be enforced in a legal tribunal.

It is also objected that the means taken to obtain a price for the stock after a tender thereof had been refused by Jamieson & Company were inadequate for that purpose, if not fraudulent, and that, hence, there is no proof properly before the court as to the value of the stock on August 31, when it was tendered, or September 22, when it was sold, and it is also contended that there was no fair sale, but a mere sham, colorable in itself and fraudulent as against the defendants Jamieson & Company ; that the only price of the stocks contemplated in the contracts at the time they were entered into and in case of a violation thereof, was the price to be fixed by the stock exchange by actual sales on the delivery days, and that as the exchange was closed from August 3 until November 5 following, no means existed by which that price could be ascertained.

We think the course pursued by the complainants was a proper one. On August 31, the exchange being closed, Schwartz & Company, acting in behalf of the complainants, tendered to Jamieson & Company 1150 shares of the stock in question, 700 of which included the shares sold by them for the complainants. This tender was refused. It is objected that the stock did not belong to the complainants when tender thereof was made to Jamieson & Company. That was not material. Their agents, Schwartz & Company, who did own the stock, made tender of it to Jamieson & Company and demanded the contract price in payment thereof. If that price had been paid and the delivery of the stock made to Jamieson & Company it would have been a good delivery. They would have had the title to the stock as against every one, Schwartz & Company

included. It was a matter, therefore, of no importance that the complainants at the time this stock was tendered did not have the legal title to it. Under these circumstances, what could the complainants or their agents, Schwartz & Company, do? A tender of the stock had been made and had been refused. The stock exchange was closed by order of its governing committee, and Jamieson had voted in favor of its closing. Were there no means by which the value of the stock at or about this time could be ascertained while the stock exchange was closed? We think there were, and we also think that the course pursued by the complainants was a proper and appropriate one.

Accordingly Jamieson & Company were notified that the stock would be sold to the highest bidder at a time and place mentioned, and that they would be held responsible for any loss that might result from their refusal to take and pay for the stock as agreed upon. They were also informed at or about that time that the sales made by Schwartz & Company had been made for complainants as to 700 of such shares. On the day named the stock was put up for sale, and it is not an important fact that it did not belong to the complainants. It was stock over which they had control, and it was offered for sale on the part of the complainants with the approval and assent of its owners, and if it had been bought by any individual at the sale other than the one who did bid it in such purchaser would have obtained a good title to the stock on payment of the price bid. Wide publicity had been given on the part of the complainants of the time when and the place where this sale would occur, and the highest bid was made by an individual who was a member of the firm of Schwartz & Company, but there were many other people there who had the right, and, as it appears, were urged to bid, and there was neither fraud nor deception in the fact that a bid was made by a member of the firm as stated. The price at which the bidding closed was fixed after a chance for full and open competition upon the part of all who were present, and although the complainants entered into some arrangement with their agents by which the latter produced the stock and offered it for sale on account of and for

the complainants, yet no injurious effect upon the transaction was thereby caused, and it in no way injured Jamieson & Company. That the bid was a fair indication of what was then regarded as the value of the stock, we think admits of very little question. When the exchange opened in November the stock sold at $130, and continued near that figure for some time.

Under all the facts in the case we think the complainants were justified in the course they pursued, and that the price at which the stock sold was a fair basis upon which to determine the amount of damages sustained by the complainant by reason of the refusal of Jamieson & Company to fulfill their contract of purchase.

*For these reasons the decrees of the Circuit Court of Appeals and the Circuit Court must be reversed, and the case remanded to the latter court for such further proceedings therein as are not inconsistent with the opinion of this court, and it is so ordered.*

MR. JUSTICE HARLAN, dissenting.

I dissent from the opinion and judgment in this case upon the ground stated by the Circuit Court of Appeals, namely, that the transactions involved in this litigation constituted gambling in "differences," in violation of the statute of Illinois.