**BOARD OF TRADE OF CITY OF CHICAGO v. L. A. KINSEY CO. et al.**

(Circuit Court, D. Indiana. July 14, 1903.)

No. 10,071.

1. EXCHANGES—PROPERTY IN QUOTATIONS—RIGHT TO PROTECTION IN EQUITY.

Conceding that the Board of Trade of the City of Chicago has a property right in the quotations of prices made on its exchange, based on legitimate transactions, it is not entitled to invoke the aid of a court of equity for the protection of its right in its quotations under evidence showing that something like 95 per cent. of the contracts made on its exchange are for the sale of commodities for future delivery, and are closed immediately after the transaction by a settlement of differences between its members, permitted by its rules, and made with its knowledge and consent at the close of each day's business.

2. SALES FOR FUTURE DELIVERY—VALIDITY—INTENTION OF PARTIES.

Whether a contract for the purchase and sale of a commodity for future delivery, made on an exchange, is legitimate and valid, or merely a wagering transaction, depends on whether it was the intention of the

¶ 2. See Gaming, vol. 24, Cent. Dig. §§ 22, 23, 25.

parties at the time that there should be an actual delivery of the commodity, and payment therefor. Such an intention is not necessarily negatived by the fact that the contract is subsequently closed out without delivery, by the payment of differences; but where it is the habitual practice and custom of the members of the exchange to so settle contracts immediately after they are made, extending to almost the entire bulk of the transactions of the exchange, it must be presumed that such was the intention when the contracts so settled were made, and that no actual sale and delivery was contemplated.

In Equity. Suit for injunction.

Henry S. Robbins and D. P. Williams, for complainant.

Smith & Korbly, Charles D. Fullen, and S. N. Chambers, for defendants.

ANDERSON, District Judge. On March 25, 1902, the complainant filed its bill for an injunction to restrain the defendants from receiving, obtaining, using, selling, or distributing the quotations of prices of grain and other commodities dealt in on the floor of the complainant's exchange in the city of Chicago. A temporary restraining order was denied by the court, and on motion of the complainant for a temporary injunction the cause was referred to a master to take the evidence. On July 8, 1902, the motion for a temporary injunction was denied, and the cause was by the court, on its own motion, referred to Hon. Edward Daniels, master in chancery, to consider the evidence already taken, and to take such further evidence as the master should deem proper and pertinent to the issues, with direction to report the facts, with his conclusions of law thereon. On October 10, 1902, the master filed his report. Both parties have filed exceptions to the finding of facts contained in the master's report, and the defendants have filed exceptions to his conclusions of law. The exceptions to the finding of facts will be overruled, except in so far as inconsistent with this opinion.

I think the master's finding of facts is sustained by the evidence, and substantially covers the case. But in some particulars the master does not go as far as the evidence warrants, and I cannot agree with his conclusions.

The master states as his conclusions of law:

"(1) The continuous quotations of a trade exchange, as defined in the foregoing findings of fact, are a species of property.

"(2) The complainant has the common rights of property in the continuous quotations of the Board of Trade of Chicago as described in the foregoing findings of fact, unless the affirmative of either one of these four propositions can be established."

No. 3 of these propositions is as follows:

"(3) That said continuous quotations are made up either entirely, or at least of such a large proportion, of fictitious prices illegitimately created in feigned trading transactions conducted with the connivance of the complainant, contrary to the inhibitions of the law against gambling, so that all of said continuous quotations must be placed in the category of nuisances per se, in which no property can exist."

The master then holds that neither of these propositions is, in law, maintainable as regards complainant's continuous quotations, and

recommends a decree in favor of complainant. In discussing the above proposition 3, the master says:

"The argument which alleges vice in these continuous quotations in effect comes to this: In the time contracts made in the pits, delivery of the property is not intended, and the proof of this fact lies in the complainant's rule, under which such time contracts are entered into, which permits the closing out of such contracts by the direct method or the ring method of settlement. If such methods of settlement do not bespeak a gambler's intent, then they are valid, and upon this phase of this suit the only question is this: Do the direct method of settlement and the ring method of settlement necessarily imply an intent on the part of the parties to time contracts not to make or receive delivery of the property sold and bought? In my opinion, that question is answered in the negative by the case of Clews v. Jamieson, 182 U. S. 461, 21 Sup. Ct. 845, 45 L. Ed. 1183. Even if there be a few gambling transactions in the pits of the complainant (and that such is probably the fact is a matter of legitimate inference from the foregoing finding of facts), still that fact would not place all the prices made in the pits in the category of nuisances per se. The entire volume of such prices cannot be so condemned."

In my judgment, proof of the fact that delivery is not intended in these contracts does not, so far as this case is concerned, lie "in the complainant's rule under which such contracts are entered into, which permits the closing out of such contracts by the direct method or the ring method of settlement." The question whether delivery is really intended is not to be determined by the form of the contracts, nor by the method by which they may be settled. To determine this, the real nature and character of the transaction must be looked into. It may quite properly be said that a rule which permits of the adjustment of transactions by settlement upon differences instead of by actual delivery does not, of itself, prove that no delivery was intended; but other evidence may clearly show what the real nature of the transaction is.

The master, in his findings, states:

"Among the daily transactions in complainant's 'pits' there are 'hedging' contracts, 'spreads' and 'scalping contracts'; and all of these forms of time contracts are adjusted by both the 'direct' method and the 'ring' method of settlement. Upon the question what part of all the transactions in the pits are adjusted by the 'direct' method and the 'ring' method of settlement the evidence is not very satisfactory. It tends to show, however, and I accordingly so find, that at least three-fourths of the total transactions in the pits are adjusted by the 'direct' and 'ring' method of settlement."

And again the master states, "Most time contracts made in the pits" are settled by these methods. I think the evidence discloses that a much larger proportion than three-fourths of the total transactions in the pits is settled by the "direct" and "ring" methods; that the proportion is nearer 95 per cent. than 75 per cent. In other words, the evidence in this case shows that almost the entire bulk of the transactions in the pits (the reports of which make up the "continuous quotations") are transactions in which no delivery is made, and which are closed by the direct or ring method of settlement. The mere fact that in a given case or in a number of cases no delivery is made is not decisive. A man may buy or sell for future delivery, and actually intend at the time of making the purchase or sale to receive or deliver the property, and then, prior to the time of the maturity of the contracts, change his mind, and offset the contracts, and

settle upon differences. In such case the transaction is legal, if he in fact intended to receive or deliver the property at the time the contracts were entered into. The determining factor is the intention of the parties at the time of making the contracts. "The generally accepted doctrine in this country is, as stated by Mr. Benjamin, that a contract for the sale of goods to be delivered at a future day is valid, even though the seller has not the goods, nor any other means of getting them than to go into the market and buy them. But such a contract is only valid when the parties really intend and agree that the goods are to be delivered by the seller and the price to be paid by the buyer; and, if under the guise of such a contract, the real intent be merely to speculate in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay the other the difference between the contract price and the market price at the date fixed for executing the contract, then the whole transaction constitutes nothing more than a wager, and is null and void." Clews v. Jamieson, 182 U. S. 461, 489, 21 Sup. Ct. 845, 45 L. Ed. 1183; Irwin v. Williar, 110 U. S. 499, 508, 4 Sup. Ct. 160, 28 L. Ed. 225; Pearce v. Rice, 142 U. S. 28, 40, 12 Sup. Ct. 130, 35 L. Ed. 925. It is perfectly plain that in almost all of the transactions, the reports of which make up the "continuous quotations," no delivery is in fact made, but that they are settled upon differences. The question then comes to this: Do the parties, at the time of making the contracts, intend delivery, or do they intend to do what they actually do—settle upon differences?

It is said that neither the number of instances in which these contracts are settled upon differences nor the proportion of them which are settled in this way is sufficient to establish that no delivery was contemplated. But certainly such facts bear powerfully upon the question of intent. Ordinarily, men are presumed to intend to do what they do in fact do. This is the presumption when the intent with which a single act is done is the subject of inquiry. Surely it cannot be said that this presumption is less strong in the case of a vast number of acts, done repeatedly and habitually. The evidence shows that the actors in these transactions, as their settled habit and practice, make contracts for future delivery, and immediately, with a uniformity of practice almost complete, settle these contracts upon differences; and they do this continuously, day after day, month after month, and year after year. Under the ordinary rule of judging the intent by the act, there seems no room for doubt that these contracts are a "mere cover for the settlement of differences"; that no delivery is intended.

The complainant asks this court to believe that the actors in these transactions do one thing and intend to do another thing. It must be conceded that in almost all these cases of purchases and sales for future delivery no delivery takes place. The court is asked to find that delivery is intended though no actual delivery is made; and this in the face of the fact that such purchases and sales are adjusted without delivery so soon after they are entered into. The master, in his findings, says:

"Most time contracts made in the pits are adjusted as between members of the complainant association before the specified time of delivery arrives by either the first or the second of the above-named methods. Direct settlements

are effected by offsetting similar contracts at the close of the business hours of each day in the following manner: As soon as it is practicable after the close of business in the 'pits' each broker (individual, firm, or corporation) conducting business in the 'pits' takes from the day's transactions on his books the contracts similar as to amount and time of delivery to counter contracts made with other members of the complainant association, and ascertains therefrom the difference of the aggregate prices of such similar contracts, and, if the difference be in his favor, the amount of such difference is charged to the other party in such counter contracts, and, if the difference is against him, such difference is credited to the other party to such counter contract. The following is a simple illustration: If during the day broker A. has sold to broker B. 5,000 bushels of December wheat at 75 cents per bushel, and broker B. has sold to broker A. 5,000 bushels of December wheat at 76 cents per bushel, after offsetting the contracts at 75 cents per bushel, there is a difference in B.'s favor of one cent on each bushel, or $50. This offsetting difference in cash is placed as a debit or credit, as the case may be, upon the clearing house sheet hereinafter described of the respective brokers, parties to said counter or offsetting contracts. The 'ring' method of settlement is as follows: Each broker (person, firm, or corporation) conducting business in the 'pits' has an employé, who is called a 'settlement clerk,' who keeps a record of all his employer's transactions in the 'pits.' The complainant association furnishes a room wherein all of such settlement clerks meet at stated hours each day, and compare their respective books, called 'settlement books,' which are required by the complainant association to be kept by each broker. Upon comparing their respective books, said settlement clerks ascertain what, if any, outstanding time contracts may be offset by some other corresponding time contract made by the parties with other members of the association, and which of such contracts are, by consent of the parties thereto, permitted to be offset, and thereupon, under the rules of the complainant association, are deemed to have been settled, provided the requirements of sections 6, 7, 8, and 9 of rule 22 of the complainant association are met as therein provided with reference to the clearing house sheet and other details of settlement therein specified."

In other words, the persons "conducting business in the pits" day after day meet in these pits, and ostensibly buy of and sell to each other enormous quantities of grain and provisions for delivery at certain specified times in the future, usually months in the future. There is no pretense whatever that these persons, or those for whom they act, have this grain and provisions on hand. This fact is met by the proposition that it is legal to sell for future delivery what one does not have, because he may procure it in time to deliver. Now, what do these persons, as soon as they make these alleged contracts, do? Does he who has sold proceed to procure the property, so that he may deliver it at the time he has agreed, or does he who has bought proceed to prepare himself to receive what he has purchased? Not at all. "At the close of business each day," "as soon as it is practicable after the close of business in the pits," these persons meet, and immediately proceed to settle their contracts upon differences by the direct method or the ring method of settlement. Between the time of making the contracts and their settlement, what circumstance has arisen to cause them to prefer to settle by differences instead of by delivery, as they ostensibly agreed? The only time that intervenes between the close of the transactions in the pits and the settlement of the contracts there made is the time required to find "corresponding time contracts" which may be set off against each other. These persons have "settlement clerks," and the clerks have books called "settlement books," and complainant provides a "settlement room" for

these "settlement clerks" to meet at stated hours each day, and compare these "settlement books," and ascertain what contracts may be settled by differences. There are no delivery clerks, no delivery books, and complainant furnishes no room in which these persons may meet and arrange for either the actual or symbolic delivery of the property ostensibly bought and sold. The entire machinery provided by complainant is for the purpose of settling these contracts upon differences; not for carrying them out by delivery.

The evidence also discloses that, when these persons "conducting business in the pits" meet to settle, all time contracts are settled upon differences, unless orders are specifically given not to settle in this way. Settlement upon differences is the rule; delivery is the exception, and the rare exception. Can it be said of intelligent men that they meet day after day and make ostensible purchases and sales of grain for future delivery, and day after day settle such purchases and sales upon differences with no pretense of delivery whatever, such being the almost universal practice, and yet that they actually intend delivery when the ostensible purchases and sales are entered into? To hold this the court must find that these persons actually intend delivery when they make the contracts, and change their minds between that time and the time of settlement, which, as the evidence shows, follows so swiftly after the contracts are made.

The master also finds that:

"It is fairly deducible from the evidence that the aggregate business transactions in grain (in the pits of the complainant association) was largely in excess of the total wheat and corn production of the entire United States during either of the years 1900 and 1901, and was many times over the entire receipts in Chicago of grain during each of said two years of 1900 and 1901, and of such receipts in Chicago less than twenty per cent. inspected up to grades of grain which could be delivered upon time contracts made by said sales and purchases in the pits."

So that it was physically impossible for more than a very small part of the grain ostensibly bought and sold in the pits to be delivered. Are men to be held to intend to do that which is and which they know to be impossible?

Again, the master finds:

"It is also true that a decrease in the total grain production of the United States does not cause a proportionate decrease in the volume of business done in the 'pits' of the complainant association, but, on the contrary, such business is larger during a year in which there is a shortage in the grain crop."

The less grain there is to be bought and sold, the more these persons buy and sell. There seems to be no legitimate relation between these dealings in the pits and the actual commodity.

If the form of the contracts and the methods by which their settlement may be accomplished are alone to be considered, the master's conclusion is correct. The contracts, on their face, are valid. "A contract which is on its face one of sale with a provision for future delivery being valid, the burden of proving that it is invalid, as being a mere cover for the settlement of 'differences,' rests with the party making the assertion." Clews v. Jamieson, supra. Therefore the burden is upon the defendants to show that no delivery is intended. I think

'the defendants have shown that such contracts are entered into without any intention, at the time, on the part of the parties to the contracts, that delivery shall take place, but that the intention is that the contracts shall be settled upon differences. Instead of real contracts for the future delivery of property, they are pretended contracts for immediate settlement upon differences. If this be the case, they are gambling transactions under the authorities above cited.

It may be said that some of these transactions are not tainted with this vice; that in them delivery took place and was intended. If the rule was delivery, and settlement upon differences the exception, a different conclusion might be reached. But delivery is the rare exception, and the intention to deliver is likewise rarely present. The complainant does not prevent the making of these illegal contracts, and permits the mingling of the illegal with the legal. I think that the proportion of these transactions which are illegal is so large as to characterize and taint them as a whole, and that whatever property right complainant may have in the "continuous quotations" in question is so infected with illegality as to preclude resort to a court of equity for its protection.