IN RE ESTATE OF OLIVIA JOHNSON.
FLORENCE HOME FOR THE AGED, APPELLANT, V. BESSIE
MUSGROVE, ADMINISTRATRIX WITH WILL ANNEXED,
APPELLEE.

13 N. W. 2d 412

FILED MARCH 3, 1944. No. 31657.

*Wells, Martin & Lane,* for appellant.

*Penelope H. Anderson, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, CHAPPELL and WENKE, JJ., and POLK and NUSS, District Judges.

WENKE, J.

This action was commenced by the Florence Home for the Aged filing a claim in the estate of Olivia Johnson, deceased, in the county court of Douglas county. Bessie Musgrove, administratrix with the will annexed, filed objections thereto and upon hearing in the county court the claim was disallowed. From that order the claimant appealed to the district court for Douglas county where the findings and judgment of the county court were sustained

and the claim disallowed. From that order the claimant has appealed to this court.

For the purpose of this appeal the Florence Home for the Aged, a corporation, will be referred to as the claimant; Olivia Johnson, deceased, as the deceased; and Bessie Musgrove, administratrix of the estate of Olivia Johnson, deceased, as the administratrix.

The claim filed in the estate of Olivia Johnson, deceased, is for the sum of $1,000 with interest at five per cent from November 23, 1932, and is based upon a contract entered into between the claimant and the deceased on that date. To this claim the administratrix filed objections setting forth that the contract lacked consideration, was based on fraud, had been paid, and was barred by the statute of limitations. From an examination of the record we will only consider the defense of payment. As stated in *In re Estate of Peterson,* 104 Neb. 574, 178 N. W. 187: "Where an administrator pleads that a claim against the estate was paid in full during the life of decedent, the burden is on him to prove that defense." See, also, *Farmers Cooperative Mercantile Co. v. Shultz,* 113 Neb. 801, 205 N. W. 288; *Washington v. Beselin,* 141 Neb. 638, 4 N. W. 2d 753; 34 C. J. S. 279.

This is an action at law in which a jury was waived and as stated in *National Engraving Co. v. Queen City Laundry,* 92 Neb. 402, 138 N. W. 575: "Where an action at law is tried in the district court without a jury, findings of fact have the same force as a verdict." "The credibility of the witnesses and the weight to be given their testimony are solely for the consideration of the jury." *Moore v. Krejci,* 139 Neb. 562, 297 N. W. 913. "The finding of a trial judge in a law action has the force of a verdict and will not be disturbed upon appeal unless clearly wrong." *Quivey v. City of Mitchell,* 133 Neb. 727, 277 N. W. 50.

The undisputed evidence shows that the deceased, Olivia Johnson, a domestic, had in 1932 reached the age of 68 years, being born on February 4, 1864. She had saved some $11,000 which she had on deposit in building and loan

associations in Omaha. The previous year she had a hip injury which somewhat incapacitated her and on or about October 1, 1932, she entered the home of the claimant for aged people, paying at the rate of $50 a month.

On November 4, 1932, she made an application to the claimant for a life membership, which was based on a rate of $500 a year for the life expectancy of the applicant, stating she had on deposit with the Omaha Building and Loan Association $3,000. This application was approved by the claimant and on November 23, 1932, a life membership agreement was entered into in consideration of $4,250 of which $3,250 was paid and $1,000 remained unpaid. The deceased in said contract represented that she had no funds or property other than that paid and agreed that if she had other property or thereafter acquired other money or property she would pay the balance and that the claimant should have a claim against her estate for the amount thereof. In the forepart of 1936 the claimant constructed a wing to its home and the Finance Committee at their March 16, 1936, meeting fixed the rates for the rooms in this new addition at $180 per annum additional for rooms with connecting bath and $300 per annum additional for rooms with private bath and toilet. The deceased desired one of these rooms with private bath and toilet and in September of 1936 moved into such a room. On September 24, 1936, she caused to be paid to the claimant the sum of $2,-000. She died on July 16, 1941, leaving an estate of over $6,000.

The dispute between the parties arises out of their disagreement as to the purpose for which the $2,000 was paid. The administratrix, who is a niece of the deceased and residuary legatee under her will, testifies that while she handled the bank books for the deceased, she did not sign withdrawal slips but that the deceased signed them and then she took them to the bank and got the money for her. That a few days before September 24, 1936, the date the $2,000 was paid, she had a discussion with the deceased and Mr. Poe with reference to the deceased occupying a room in the

new wing. This conversation took place in the room then occupied by deceased. That deceased expressed her desire to move into a room in the new wing, the cost of which Mr. Poe stated was $1,000 with private bath and $850 for regular bath. That Mr. Poe stated that the deceased owed $1,000 on the original contract and that they had better pay that because it was drawing interest and that the claimant would have a first claim if she passed away and there was anything left. Administratrix testified: "I said, 'Well, then, she will have to pay $2,000.00', and he said 'Yes', and she did pay the $2,000.00, and I said, 'Well, that makes her all paid up then', and he said 'Yes'." The deceased signed a withdrawal slip on the Omaha Building & Loan Association for $2,000 directing it to be made payable to the claimant. Administratrix then obtained a check from the Association on September 24, 1936, and took it out to the home and gave it to Mrs. Poe, Mr. Poe being absent. Mrs. Poe offered to give her a receipt for the check but she told her to give it to the deceased as it was her money. She had no knowledge of the supplemental agreement issued by the claimant on September 26, 1936, until after the death of deceased, nor of the receipt issued by the claimant on September 25, 1936, nor the contents thereof.

Mrs. Earl W. Gannett, who is neither related to nor a beneficiary under the will of the deceased, testified that she was a close friend and that she and her husband were her business advisers, she having worked in their home as a domestic for over 21 years. That after the deceased entered the home of claimant she frequently visited her there. That she discussed with Mr. Poe, before deceased moved into the new room, the advisability of her paying $1,000 for a room with private bath, which amount Mr. Poe had told her it would be, or taking a cheaper room with connecting bath at $850 or not moving into the new wing.

No demand was ever made on deceased after September 24, 1936, for the payment of this claim nor was any investigation made by claimant to ascertain if she had any additional assets with which to pay.

Lloyd E. Poe, who had been superintendent of the claimant's home for 11 years, testified that in 1936 the deceased's expectancy was 7.1 years. That based on the $300 per annum rate fixed by the finance committee as a charge for a room with private bath in the new wing, the regular charge to the deceased at the time of her moving, which he testifies was September 19, 1936, was $2,130. He testifies that shortly after August 27, 1936, he went to the home of Mr. and Mrs. Earl W. Gannett and discussed with them the cost of the new room. He stated to them it would be $2,130 based on her expectancy of 7.1 years at $300 a year and that he also discussed with them the balance owing on the contract. He denies that he ever quoted to Mrs. Gannett any other figures. He also testifies that he did not recall any such conversation as the administratrix testifies to and denies ever having told any one that the charge to the deceased for the new room would be less than $2,000. On the day following the delivery of the $2,000 check to Mrs. Poe, Mr. Poe issued a receipt found in the papers of the deceased at the home after her death as follows:

"Sept 25 1936
"Received of Mrs. Muskgrove Two Thousand—00/100 Dollars for Miss Johnsons new room
"$2000.00                                 B. L. Poe"

The next day the claimant issued the following supplemental agreement signed only by the claimant which he testifies he delivered to the deceased:

"Supplemental Agreement to be attached to Life Membership Contract for room with private bath in new addition.

"Omaha, Nebraska, September 26, 1936.

"In consideration of the payment of $2000.00 by Olivia Johnson, the receipt of which is hereby acknowledged, the Florence Home for the Aged agrees to provide Olivia Johnson a room with private bath in the new addition of the Florence Home during the balance of her life membership contract dated November 23, 1932, said room to be assigned by the Home. All other terms and conditions of said life membership contract to remain the same and in full force and effect.

"This supplemental agreement is attached to and made a part of the above referred to life membership contract.

"FLORENCE HOME FOR THE AGED

"By   G. H. Payne
President
"Attest:   L. E. Poe
Assistant Secretary."

The cash journal of the claimant as of September 26, 1936, has the following entry: "Surplus income, Olivia Johnson, new building, additional payment, room with bath, $2,-000.00." And account No. 3-1 of life members in the new addition has the following entry: "Olivia Johnson, additional payment, room with bath, $2,000.00."

This evidence presents a conflict on the question of the purpose for which the $2,000 was paid on September 24, 1936. Both lower courts found it included payment of the balance owing on the original contract of November 23, 1932, and disallowed the claim, and under the rule, as often announced by this court, that a verdict or findings on conflicting evidence will not be disturbed on appeal, the action of the lower court is affirmed.

AFFIRMED.

CARTER, J., dissents.

PAINE, J., dissenting.

I respectfully dissent from the opinion which was adopted by a bare majority of the court.

The evidence discloses that the Florence Home for the Aged is a non-profit, charitable corporation, located at 7915 North Thirtieth street in the city of Omaha, and at the time of the trial was accommodating about 100 life members, and in addition some temporary boarders, who paid the Home $50 a month. It has 25 employees to conduct the Home.

The management of the Home prefers that a person seeking to become a member of the Home shall first become such a temporary boarder for a few months, for the purpose of seeing whether such person would like to become a permanent member of the Home, as well as to enable the

management to ascertain whether it desires to accept such person into the Home permanently. The terms upon which members were admitted to the Home required the payment of $500 a year for the remaining years of the applicant's life expectancy, as shown by the approved insurance tables of expectancy.

Miss Olivia Johnson had broken her hip in October, 1931, and it was very difficult for her to get around, and she desired to become a member of the Home, and on November 4, 1932, signed a printed application for membership. This application, exhibit No. 1, gave her birth as February 4, 1864, and set out that she had $3,000 in the Omaha Loan and Building Association.

On the 23d day of November, 1932, she signed exhibit No. 2, a typewritten contract for life membership with the Home, which was prepared in the Omaha National Bank building, in the office of G. H. Payne, then president of the Florence Home for the Aged, witnessed by L. E. Poe, superintendent. This exhibit No. 2 provided that at her age and expectancy the life membership fee would be $4,250, but as she was unable to pay that full amount, and has represented to the officers of the Home that she had no funds or property of any kind other than the sum of $3,250 which she would pay in cash, the same would be accepted upon the definite understanding and written agreement that, if the second party now has other property, or hereafter acquires other money or property, the second party will pay the balance of the regular membership fee, with interest thereon at 5 per cent per annum from date until paid, "and the party of the First part shall have a claim against her estate for the said amount if the party of the Second part dies leaving any property subject to administration."

In addition to this carefully prepared typewritten contract, exhibit No. 2, there was stapled to the back of it a printed stock contract for life membership, signed by the parties at the same time. This provided the rules and regulations between the "Home" and the "Member," and upon violation of rules member could be discharged.

Miss Olivia Johnson, upon signing this contract, exhibit No. 2, and the printed stock contract, became a member of the Home, and remained such until she died.

During the year 1936 the Home started to build a new addition. This would contain better rooms, for some of the rooms would have private baths and some would have a bath between two rooms, and Miss Johnson watched the building of this addition and had her heart set upon having one of the best rooms in the new addition, with a private bath and, against the advice of her friends, she insisted upon moving. The prices of the new rooms were higher, and figured on her expectancy would have fixed the cost of the new room at $2,100 in addition to the basic membership.

The official minute book of the finance committee shows, under date of March 16, 1936, among other things, that rates were fixed in the new addition at $180 additional a year for rooms with connecting bath and $300 a year additional for rooms with a private bath and toilet. The evidence shows that others who moved into the new part paid these prices.

Miss Johnson's expectancy in 1936 was 7.1 years, and at $300 a year, the amount necessary for her to pay to change from the small room she had in the old part to one of the very best rooms in the new part, with private bath and toilet, would be $2,130.

Exhibit No. 3 was prepared and signed, and reads as follows:

"Supplemental Agreement to be attached to Life Membership Contract for room with private bath in new addition.

"Omaha, Nebraska, September 26, 1936.

"In consideration of the payment of $2000.00 by Olivia Johnson, the receipt of which is hereby acknowledged, the Florence Home for the Aged agrees to provide Olivia Johnson a room with private bath in the new addition of the Florence Home during the balance of her life membership contract dated November 23, 1932, said room to be assigned by the Home. All other terms and conditions of said life

membership contract to remain the same and in full force and effect.

"This supplemental agreement is attached to and made a part of the above referred to life membership contract.

"FLORENCE HOME FOR THE AGED
"By   G. H. Payne
President
"Attest:   L. E. Poe
Assistant Secretary"

Exhibit No. 4, given Miss Johnson at the time, reads as follows:

"No.———                                    Sept 25 1936
"Received of Mrs. Muskgrove Two Thousand—00/100 Dollars for Miss Johnsons new room
"$2000.00                                    B. L. Poe"

Exhibits Nos. 13 and 14 show the ledger entries made at the time. Exhibit No. 14 is account No. 3-1, under date of September 26, 1936, on ledger sheet 1054 of the cash journal, and reads: "Olivia Johnson, additional payment, room with bath, $2,000.00." This entry shows the surplus amounts received from life members for rooms in the new addition.

Exhibit No. 13, shown in the ledger, reads: "Surplus income, Olivia Johnson, new building, additional payment, room with bath, $2,000.00."

Miss Olivia Johnson died July 16, 1941, and the inventory filed by her administratrix with will annexed disclosed that she owned $3,196.98 of stock in the Omaha Loan and Building Association and $3,060.42 of stock in the Conservative Savings & Loan Association, making a total amount of $6,-257.40, and the Home filed a claim against her estate for the balance due of $1,000 with interest at 5 per cent from November 23, 1932, and attached to said claim the contract providing for the payment of said sum from her estate, as signed by her November 23, 1932, upon which contract she was admitted to the Home. In the answer filed by the administratrix, Bessie Musgrove, it is alleged that this original contract dated November 23, 1932, was secured by

fraud, deceit, and misrepresentation. She further alleges in her answer that "plaintiff knew that the said Olivia Johnson was incompetent on the 25th day of September, 1936, and that she had been so for some time prior thereto and that she continued incompetent thereafter."

It is alleged, and argued strenuously, that the Home committed a fraud upon Miss Johnson because it took advantage of her when she was an elderly, infirm old lady, who was only experienced in domestic service. The record does not support such a charge, but rather indicates that she was a keen, thrifty woman, who had not only accumulated a competence from her savings, but very carefully concealed the amount of her assets from every one.

The Home offered its original records in evidence in support of its claim. Exhibit No. 12 is the original record, as found in the minute book, of the meeting of the finance committee of November 14, 1932, and reads as follows:

"Application of Miss Olivia Johnson for membership in the Home was submitted. Miss Johnson is sixty-nine years old and should pay about $4250.00. She claims that $3,-000.00 is all that she has deposited with the Omaha Loan & Building Association. On motion made and carried her application was accepted with a beneficiary clause, on the condition that the President and Treasurer were satisfied that she had enough money to pay her incidental expenses and burial, and with the request that any additional funds she has should be deposited with us for the above purpose. Secretary Poe was requested to investigate the case a little further."

In reference to the original contract, Mrs. Musgrove testified: "Then she made an agreement for a life membership, but she took care of that herself. * * * I had nothing to do with that, no."

Mrs. Earl W. Gannett was called by the administratrix, and testified on direct examination that Olivia Johnson had worked as their cook and housekeeper for 21 years; that "she had had a fractured hip and she had to go some place and we all discussed it and thought that was a very good

place to go." She testified that she knew Olivia Johnson had signed up a life membership, and it was her understanding that the price was $4,250; that she still owed $1,000, for which she gave a note, but had paid the remainder, as Mrs. Gannett understood it.

When the terms of $2,000 were agreed upon between Miss Johnson and the Home, then Miss Johnson signed a withdrawal slip, requesting that a check for $2,000 be made to the Home, and Mrs. Musgrove brought out the check and gave it to Mrs. Poe in the evening. She was asked to wait and get the receipt, and replied: "You give it to Aunt Olive. It belongs to her. It was her money." Mrs. Musgrove testified that she did not see this exhibit 4 until after Miss Johnson's death, when it was found in her box with her other papers.

Mr. Lloyd E. Poe in his testimony stated that he told Mr. and Mrs. Gannett that the price of the room which Miss Johnson wanted would be $300 additional a year for 7.1 years of her expectancy, or $2,130, and that the figure of $2,000 was definitely agreed upon with Miss Johnson. He testified that he did not recall any conversation with Mrs. Musgrove at all about the price of the new room. With the ledger sheets in his hand, Mr. Poe testified that the entries showed: "Olivia Johnson, additional payment, room with bath, $2,000.00" and that he never told any one that the cost of the new room was anything less than $2,000.

The officers of the Home and Mrs. Musgrove, her residuary legatee, were each trying to dissuade Miss Johnson from changing from her old room to the new room, the officers because the old room was next to the dining-room, and Miss Johnson was crippled, so walking was difficult, and she could not use the bath in the new room without help anyway. Under these circumstances, it does not ring true that the Home, with such a demand for these new rooms, would give her a new room at a rate of less than one-half of the price that others were paying for such a room. Mrs. Musgrove testified that Miss Johnson was given a $2,000 room for only $1,000, and that the other $1,000 was to pay off the

valid written obligation of the balance due under the contract of November 23, 1932. Such a plea of payment being an affirmative defense, the burden rests upon the one who alleges it. See *Washington v. Beselin,* 141 Neb. 638, 4 N. W. 2d 753; 34 C. J. S. 279.

"There is always a presumption arising from the instrument itself that it sets forth correctly the agreement of the parties." *Sweley v. Fox,* 135 Neb. 780, 284 N. W. 318. See, also, 23 R. C. L. 365, sec. 65.

"The best evidence of the terms of a contract in writing is the writing itself, and parol evidence is not admissible unless the instrument is lost or its absence is otherwise satisfactorily explained." 32 C. J. S. 717.

Does it stand to reason that a philanthropic institution of standing in the community would falsify its record in its minute books of transactions of its business? Or that it would be dishonest with a hundred other members by giving Miss Johnson a room at one-half the price the others were paying for that accommodation? Or that its entries in its books of account are untrue and false in reference to this one transaction?

As a general rule, original written accounts and books of account are the best evidence of the matters they contain. Books of account are competent to prove the performance of a contract, and to show that credit was given as agreed between the parties.

Where book entries were made by a corporation contemporaneous with the time the transaction took place, they are somewhat in the nature of *res gestæ,* and there has been no impeachment of these book entries by any competent evidence.

As stated in the majority opinion, the evidence in behalf of allowing the claim for the balance due under the written contract with the Florence Home presents a conflict on the question of the purpose for which the $2,000 was paid on September 24, 1936.

On one side, we have the written contracts, receipts, and minute book entries of the meetings of directors, and reso-

lutions adopted in reference thereto, together with book entries made at the time of the financial transactions, as well as the positive oral evidence of the manager of this Home.

On the other side, we have the evidence of the lady for whom Olivia Johnson had worked as cook and housekeeper for 21 years, and after leaving her employ "she had had a fractured hip and she had to go some place and we all discussed it and thought that was a very good place to go." But the principal oral evidence against the claim is by Mrs. Bessie Musgrove, who did not want her aunt, Miss Johnson, to take the better room with a private bath, nor to pay the Home any more on this written contract. Why? The answer is not far to seek. May it not be found in the fact that she is the residuary legatee under her aunt's will, and will personally receive the $1,000 if she can prevail upon the court to reject this claim?

"The decisions are numerous that logical inferences which may be drawn from existing proved facts possess a very strong evidentiary value, and oftentimes are allowed to overcome positive testimony." *Smith v. Bankers Nat. Life Ins. Co.*, 130 Neb. 552, 265 N. W. 546.

I am authorized to state that Nuss, District Judge, concurs in this dissent.