W. H. BARNHART, APPELLEE, V. WAYNE HENDERSON, APPELLANT.

24 N. W. 2d 854

FILED NOVEMBER 12, 1946. No. 32105.

R. J. *Shurtleff* and R. M. *Kryger,* for appellant.

*Peterson & Peterson,* for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

This is an action at law wherein the plaintiff, as shipper, claims he made an oral agreement with the defendant that the defendant transport a truckload of hogs to a certain destination and collect the purchase price thereof upon delivery to the consignee, by taking a draft in payment therefor. The driver of defendant's truck failed to collect in accordance with the agreement. Plaintiff sues to recover the balance due on the purchase price of the hogs, the consignee having made payment in part. Jury was waived, and trial had to two district judges. The court found generally for the plaintiff and against the defendant, and that there was due and owing from the defendant the sum of $1,242.31, with interest; that the allegations contained in the petition of the plaintiff were true, and that the plaintiff should have and recover from the defendant the sum of $1,242.31, interest and costs. Judgment was rendered accordingly. From the overruling of the motion for new trial, defendant appeals.

While the petition designates one R. L. Colson, first real name unknown, as a defendant, he is not a party to this appeal.

For convenience the parties will be designated as they appeared in this action in the district court, with the ex-

ception of defendant, R. L. Colson, who will hereafter be referred to as Colson.

The petition alleges, in substance, that the defendant is engaged in the trucking business, and R. L. Colson is an employee of the defendant; that on or about April 10, 1944, the plaintiff entered into an oral agreement with Walter Brandt, by and through his agent Arnold Brandt, to sell and deliver to Walter Brandt 146 head of hogs at the agreed price of 12½ cents per pound, to be delivered to the farm of Walter Brandt at La Porte City, Iowa, and upon delivery, either Walter or Arnold Brandt to pay the full purchase price in the sum of $2,381.25; that on the same day the plaintiff and defendant entered into an oral agreement by which the defendant, or his authorized agent, specifically agreed to transport 146 head of hogs belonging to the plaintiff from Niobrara, Nebraska, to La Porte City, Iowa, at the rate of 60 cents per hundred pounds for 20,000 minimum pound load, plus federal transportation tax; that the hogs were to be consigned to Walter Brandt, and in consideration the defendant agreed to collect from Walter or Arnold Brandt, upon delivery of the hogs, the sum of $2,381.25, in full payment for the hogs; that in lieu of cash upon delivery, it was agreed that the defendant, or his authorized agent, should accept a draft in said amount less trucking expense and transportation tax, which was to be paid by the consignee; that on or about April 12, 1944, in pursuance to the agreement, R. L. Colson, defendant's authorized agent, loaded 146 head of hogs at Niobrara, Nebraska, and at that time the plaintiff again specifically instructed Colson to deliver the hogs to Walter Brandt and upon delivery collect the sum of $2,381.25, as follows: Trucking expense and tax to be paid by the consignee, the balance in the form of a draft payable to the plaintiff, with the understanding that the hogs were not to be delivered until payment was received; that the hogs were delivered to Walter Brandt, accepted by him, and transportation expense and tax paid to the defendant, but that Colson failed and neglected to secure a draft for the sum of $2,257.26 for

delivery of the hogs in compliance with the agreement. The plaintiff thereafter made demand upon the defendant for the draft in said sum. The defendant failed and refused to deliver the draft or pay such amount to the plaintiff. On or about April 15, 1944, Walter Brandt paid to the plaintiff, on account of the shipment, $1,000, leaving a balance of $1,257.26 due and owing to the plaintiff which Walter Brandt has failed, neglected, and refused to pay, and plaintiff prays for the recovery of such balance due.

The amended answer admitted the defendant was engaged in the trucking business; denied generally all of the allegations of the plaintiff's petition; and alleged that Colson was an employee only, with no authority, actual, apparent, or ostensible, to enter into the contract as alleged in the petition, and denied that he made any such contract.

The amended answer further alleged, in paragraph 5, that on April 10, 1944, the defendant, at the request of plaintiff, agreed to transport a load of hogs from Niobrara, Nebraska, to a point in Iowa to be designated by the plaintiff, the hogs to be loaded at Niobrara, Nebraska, on or about April 12, 1944, in return for which transportation services the defendant was to receive the rate of 60 cents per hundred pounds for a 20,000 pound minimum load, plus federal transportation tax. This paragraph of the amended answer was admitted in the reply of the plaintiff.

The following quoted allegation is admitted by the plaintiff in the reply: "That on or about the 12th day of April, 1944, this defendant sent his employee, R. L. Coleson, with a truck to Niobrara, Nebraska; and loaded said hogs and delivered the same to the consignee thereof in Iowa."

The amended answer further alleged that the consignees, for good and sufficient reasons, refused to give a draft for the sum after the hogs were unloaded, and said they would settle direct with the plaintiff; that previously the plaintiff had sold consignees diseased hogs to their damage, and on account thereof, neither of the consignees would have given a draft or money to the plaintiff or defendant at the time of delivery had payment been demanded.

The reply of the plaintiff, except as heretofore indicated, denied generally all the allegations of the amended answer.

The record discloses: The defendant has been, and is, engaged in the trucking business at Orchard, Nebraska. During his absence, his wife is in charge of the business. The plaintiff is a resident of Niobrara, Nebraska, and in 1944 was engaged in buying and selling feeder pigs. Between the first and fifth of April, 1944, the plaintiff engaged the defendant to haul some feeder pigs from Niobrara, Nebraska, to consignee Arnold Brandt's farm eight miles south of Waterloo, Iowa, and accompanied him. Upon arriving at their destination, the pigs were unloaded and it was agreed between the plaintiff and Brandt that settlement would be made for them the next morning. The plaintiff testifies to a conversation had at the President Hotel in Waterloo, Iowa, between himself, the defendant, and Brandt, wherein a deal was made that the defendant was to haul a second load of hogs, collect for them, and to receive 60 cents per hundred pounds, with a minimum load of 20,000 pounds and, in addition, payment of the federal transportation tax. The defendant denies that this conversation took place in the hotel, but his version is that before he and the plaintiff left town, either the plaintiff or Brandt asked him if he could deliver another load of hogs and he said he could. The plaintiff wanted to fix it so he would not have to accompany the defendant, but wanted the defendant to collect for the hogs and the defendant agreed to do so. Defendant testifies there was no mention that he was to receive a draft from Brandt when the second load of hogs was delivered.

On or about April 9, the defendant transported the second load of hogs to Arnold Brandt's farm, arriving there about two o'clock on a Sunday afternoon, and unloaded the hogs. Brandt wrote out a check for the amount due on the hogs, payable to the plaintiff which was mailed to him by the defendant and, in addition, gave the defendant a check for transportation and the federal transportation tax.

On or about April 10, the plaintiff called the defendant by telephone and informed him that he had another order

for a load of hogs from Brandt, from Dysart, Iowa, and that if the defendant could, he wanted him to haul them, and the defendant said he could haul them at any time. He also told the defendant that the buyer had sent a check for the hogs, and the understanding was that he was to send a draft. The defendant said the reason the buyer did not send a draft was because the hogs were unloaded on Sunday. He said, "The next time Barney I'll get a draft."

The third load of hogs, the subject-matter of this controversy, was loaded at Niobrara on April 12, 1944. Arnold Brandt placed the order for his brother, Walter Brandt, who resided at La Porte City, Iowa. Walter was going to pay for the hogs and Arnold was to receive a margin of 25 cents a hundred, profit, and wanted one invoice at $12.75 per hundred weight and another at $12.50 per hundred weight for vaccinated hogs delivered, less the defendant's trucking charge of $120, and three percent tax. The hogs were to be delivered in the daytime, as it was difficult to get to Walter Brandt's premises at night.

The defendant's wife sent a driver named Colson to Niobrara for the purpose of loading and transporting the third load of hogs to their destination. He was furnished expense money, and she knew the charge to be made for the transportation. Colson also testified that he knew the charge to be made.

There is a sharp conflict in the testimony as to just what information the defendant possessed with reference to the arrangements made concerning the third load of hogs.

When Colson arrived at Niobrara and the hogs were loaded, the plaintiff testified he gave him instructions as to the direction he was to go, how to call Arnold Brandt on the telephone from Waterloo, and to collect for the hogs on arrival, and Colson said he understood that, that the defendant had explained that to him before he left home. This conversation took place on two occasions, once in the elevator where the weights of the hogs were figured, and a second time in front of the old post office. Also present at the time of the first conversation were Bud Burns and Tom

Montgomery. Bud Burns assisted in loading the hogs. The plaintiff gave Colson a stamped envelope addressed back to him, and told him when he got this draft for the hogs to put it in the envelope and mail it to him, and he said he would. He said Henderson explained that to him before he left home. The second time the matter was brought up, he said he understood all that, and took the invoices, the health certificates, the permit, and a letter written by the plaintiff to Arnold Brandt (exhibit 5) wherein the plaintiff told Brandt he was sending 146 feeder pigs and that there was one large spotted pig for which, due to his condition, he could deduct a dollar a hundred; the scale tickets were also enclosed. He further stated in the letter that he would like to have the addressee send a draft, as the bank in Niobrara would not give him credit until the check had cleared, and it would make him short. He read this letter to Colson.

The witness, Bud Burns, testified that he heard the plaintiff tell Colson several times to collect for the hogs, and Colson said: "I understand it all." The witness Montgomery testified that the plaintiff told Colson where to take the hogs, and when he delivered them, to collect on delivery. Colson's version of the transaction was that certain papers were delivered to him; he did not know the contents of the sealed envelopes, nor was he apprised of the letter written by the plaintiff to Arnold Brandt; that he was informed by the plaintiff to bill the hogs to Walter Brandt. He was informed to make the delivery of the separate sealed letters, one to Walter Brandt and one to Arnold Brandt; that there was nothing said, in addition to telling him what to do with the envelopes, until he started to pull up, and the plaintiff hollered at him and said: "I want to tell you, don't take a check, tell him to send a draft because this little one-horse bank can't cash a check," and Colson said: "I'll tell them and that's what was said. * * * That's all; he told me how to get there * * *." The plaintiff did not tell him how much would be due on the shipment, and he did not know how much he was supposed to collect, if he

had been authorized to do so. That during the period of time for which he drove for the defendant, he was not authorized to bind the defendant in any manner, with reference to the amount to be paid for transportation, or to collect from third persons for shipments of merchandise carried, and he was not authorized to negotiate or contract for c.o.d. deliveries, and on this occasion, had no authority to do so from the defendant or his wife. The hogs were delivered to Walter Brandt's place. They were unloaded and accepted, with the exception of one which was sick and it returned with the truck. After the hogs were unloaded and Colson went to the truck, one of the Brandts came with a check for the amount of the hauling, and offered to write a check to the plaintiff. Colson informed them: "Barney won't take a check." Brandt replied that he would get a draft in the morning, or that afternoon—he wanted to get the hogs on dry ground. He said, "* * * we'll send Barney a check or draft in the morning * * *." Colson said he just as well go home, and one of the Brandts replied: "Be sure to tell Barney that I am not satisfied with that second load of hogs." On cross-examination he testified he left the hogs there as he thought they had had enough ride.

The defendant testified that the first time he ever heard that a draft was to be obtained from the consignee for the third load of hogs was when Colson arrived home on April 14 and told him the plaintiff did not want a check, he wanted a draft, and they had offered him a check. The defendant further said he did not know anything about it, and expected that the plaintiff would get the draft in the mail, and that they would send it to him. A few days thereafter the plaintiff called the defendant's place of business and inquired about the draft, stating he did not receive it, and the defendant's wife said she knew nothing about it, and informed him that the defendant was in O'Neill. The plaintiff and one Frank Stewart drove to Orchard and went to the defendant's home and were informed by his wife where Colson lived. The plaintiff went over to the Colson home and had a conversation with him, in which Colson

told him that the man agreed to send the money back, and that he drove off and left the hogs there and did not collect for them because he thought the man was honest; that the man paid him the trucking, and the hogs were satisfactory, except one which was returned.

Stewart testified that Colson stated the reason he did not collect was that: "Mr. Brandt said he would mail you a check or draft, at the time I delivered them he was vaccinating pigs, he didn't want to go to town, and thought it would be all right. I thought you would have it by now."

The plaintiff and Stewart then drove to O'Neill, and there contacted the defendant. The plaintiff told the defendant that he did not have his money for the load of hogs, and defendant said that was funny, and that he had not talked to Colson about it since he got back. The plaintiff told him about the deal with Colson. This conversation resulted in a letter to be written by the defendant in behalf of the plaintiff, to Walter Brandt. This letter, exhibit 1, is as follows: "April 21, 1944. Mr. Walter Brandt:—My driver delivered a load of pigs to you April 13th and in which he was to return with a draft to cover the cost of the pigs, and to be mailed to Mr. Barnhart of Niobrara. This was part of our duty to collect for the pigs and my man trusting you would mail the draft direct to Mr. Barnhart.

"I don't like to be implicated in this case but Mr. Barnhart feels that we haven't fulfilled our duty.

"Arnold gave my driver a check to cover the hauling, and thanks.

"Mr. Barnhart says he only received part payment on the pigs or around $1,200.00 due yet.

"Hoping everything is O.K and that this is an over site or a mistake.

"Mr. Barnhart wanted me to write you and get this settled up.

"Thank you. Sincerely, Wayne Henderson."

The defendant acknowledged he wrote the letter to help the plaintiff make the collection, but what he had stated therein was not in fact the truth, and that he wrote it prior

to the time that he was reliably informed as to his rights in the matter; that the only agreement he had with the plaintiff was to collect for the second load of hogs, which he did.

Colson testified with reference to the conversation had with the plaintiff on April 21, that the plaintiff wanted him to sign a paper as to the amount of the transportation received for the hogs, indicating that there had been an overcharge for which the Brandts wanted the plaintiff to make good. In this connection, exhibit 13, a letter from Colson to Barnhart appears in the record. It is as follows: "3rd load Delivered April 13. I Delivered these hogs to Walter Brandt and they were satisfactory all But one and I Brought him Back I told Brandt I was to collect for these hogs on Delivery—he Paid me the trucking which was 120.00 & tax 3.60, or 123.60 and Promised to send the Draft for Bal Due Barnhart I took his word for this and came with out the Money as I thought he was Honest and would Pay as I was in a Hurry to get home as him and Barney had Been Doing Before." Signed, "R. L. Colson." Colson testified that the first six lines were not on the paper when he signed it; that no hogs were mentioned in the written statement, and that whatever was attempted to have been written after "hogs" was not there when it was signed.

Arnold Brandt testified that Colson said he wanted to take a draft back, and "I told him my hogs took sick and I wasn't sending a draft with him but I would settle with Mr. Barnhart," and sent him $1,000. The only other offer of payment to the plaintiff was $86.75 by check, which he returned. This deduction was made by Brandt because there was expense incident to sickness among the hogs, and loss due to death of some of them.

The testimony of Walter Brandt was to the effect that he made all settlements with his brother Arnold, not to the plaintiff, and that he had had expense because of his hogs contracting cholera, and a number of them died.

The foregoing constitutes substantially the evidence upon which the district court made its findings and judgment.

The defendant predicates error on the part of the district court, contending the findings and judgment are contrary to the evidence and the law.

The defendant argues that the reply of the plaintiff, having admitted paragraph five and a portion of paragraph six of the amended answer, admitted the contract between the parties as contended for by the defendant, that the admission is conclusive, and neither party could introduce evidence contrary to the admission, citing Bonacci v. Cerra, 134 Neb. 476, 279 N. W. 173, as follows: " 'The pleadings in a cause are, for the purposes of use in that suit, not mere ordinary admissions, * * * but judicial admissions * * * i. e., they are not a means of evidence, but a waiver of all controversy (so far as the opponent may desire to take advantage of them) and therefore a limitation of the issues. Neither party may dispute beyond these limits. Thus, any reference that may be made to them, where the one party desires to avail himself of the other's pleading, is not a process of using evidence, but an invocation of the right to confine the issues and to insist on treating as established the facts admitted in the pleadings.

"This much being generally conceded, it follows that a party may at any and all times invoke the language of his opponent's pleading on that particular issue as rendering certain facts indisputable; and that, in doing this, he is on the one hand neither required nor allowed to offer the pleading in evidence in the ordinary manner, nor on the other hand forbidden to comment in argument without having made a formal offer; for he is merely advocating a construction of the infra-judicial act of waiver of proof.' 2 Wigmore, Evidence (2d ed.) sec. 1064."

It will be noted that the controverted issues which remained, as set forth in the pleadings, and which were left for the determination of the court were whether or not the contract contained the additional agreement providing for collection upon delivery of the purchase price as alleged in the petition and denied in the answer, and whether a breach of said terms did occur, and the amount of recovery

the plaintiff was entitled to if the court found such to be the contract terms.

"When an admission is treated as a matter of pleading excusing the pleader's opponent from offering evidence on the point admitted, the admission is necessarily conclusive as to the fact admitted, but it does not preclude the party making it from proving other independent facts in avoidance of those admitted." 41 Am. Jur., Pleading, § 201, p. 435.

The admission of the plaintiff, in his reply, of paragraph five and a portion of paragraph six of the defendant's amended answer, is conclusive as to the facts admitted, but, as herein set forth, other facts were pleaded in the petition that were denied by the answer and upon which there was an issue to be tried, and which were not admitted. The defendant's contention is without merit.

The defendant also contends that there was a material and fatal variance between the pleadings and the evidence, and cites Bauer v. Wood, 144 Neb. 14, 12 N. W. 2d 118: "The rule of law is inflexible that the allegations and the proof, *allegata et probata*, must agree."

From an examination of the evidence, we conclude that section 25-846, R. S. 1943, is applicable. It provides in part: "No variance between the allegation in a pleading and the proof is to be deemed material unless it have actually misled the adverse party to his prejudice, in maintaining his action or defense upon the merits." We conclude the defendant was not misled to his prejudice in maintaining his defense upon the merits.

The plaintiff and defendant are in accord that a carrier receiving merchandise on a c.o.d. shipment acts as bailee to transport the goods, and as agent to collect the price; that c.o.d. is a term that means collect on delivery, and arises only by contract. Mogul Inc. v. Lavine Inc., 247 N. Y. 20, 159 N. E. 708, 57 A. L. R. 934; Danciger v. Wells, Fargo & Co., 154 F. 379.

"The duty of a carrier to collect the amount due the consigner, upon delivery of the goods, arises only by contract.

\* \* \* A contract by which the carrier undertakes to collect on delivery may be verbal, \* \* \*." 13 C. J. S., Carriers, § 186, p. 382.

The defendant contends that a contract between a shipper and a carrier which authorizes the carrier to part with possession of the goods before collection is not a c.o.d., or collect on delivery, contract.

Whether or not the defendant's contention in this respect is sound, depends solely upon the evidence. It is in dispute as to whether the hogs were to be delivered and the draft taken in payment of the purchase price, or whether upon failure of the consignee to pay the purchase price the hogs should be returned by the carrier. The district court resolved this question in favor of the plaintiff, and the evidence is sufficient to show a collect on delivery contract.

The defendant next contends that the employee, Colson, was in no sense an agent of the defendant, and was not authorized to enter into any contract with the plaintiff to transport the hogs and collect a draft from the consignee upon delivery to him. In the light of the evidence, we are not in accord with the defendant's contention in such respect. In considering this contention of the defendant, exhibit 9 becomes important, likewise exhibit 13.

Exhibit 9 has heretofore been set out in full. In it the defendant admitted that it was part of his and Colson's duty to collect for the hogs, and that Colson, his employee, trusted Walter Brandt, the consignee, and delivered the hogs and was to return with a draft to cover the cost of the hogs, the draft to be mailed to the plaintiff.

Exhibit 13 has heretofore been set out. It is a statement by Colson that he delivered the hogs and was to obtain a draft for payment. The court obviously considered these exhibits.

"It is a well-established rule of law that if one, not assuming to act for himself, does an act for or in the name of another upon an assumption of authority to act as the agent of the latter, even though without any precedent authority whatever, if the person in whose name the act

was performed subsequently ratifies or adopts what has been so done, the ratification relates back and supplies original authority to do the act." 2 Am. Jur., Agency, § 209, p. 166. See Clews v. Jamieson, 182 U. S. 461, 45 L. Ed. 1183, 21 S. Ct. 845.

" 'Ratification by the principal of the unauthorized act of his agent has the same effect as prior express authority, and generally relates back to the time when the unauthorized act was done.' " Lincoln Joint Stock Land Bank v. Bexten, 129 Neb. 422, 261 N. W. 845. See, also, General Credit Corporation v. Moore, 128 Neb. 881, 260 N. W. 368.

The evidence is sufficient to show that the defendant ratified the acts of his employee, Colson, in all respects, and the trial court did not err in this respect by finding generally in favor of the plaintiff and against the defendant.

The defendant raised the further question, whether or not the petition sufficiently alleged damages to entitle the plaintiff to recover. The general rule as to pleading damages is as follows: " 'Such damages as may be presumed necessary to result from the breach of contract need not be stated with any great particularity in the declaration. But in other cases it is necessary to state the damages resulting from the breach of contract specifically and circumstantially in order to apprise the defendant of the facts intended to be proved.' (1 Chitty Pl., 371.) Damages which necessarily result from the injury complained of may be recovered without a special statement of the same." Kingsley v. Butterfield, 35 Neb. 228, 52 N. W. 1101.

As previously stated, this action is an action on the contract for a specific sum of money which the defendant failed to collect. Even if the petition was faulty as to the measure of damages, the cited case would prevail, and the petition is, in all respects, sufficient in allegation to sustain the amount of the judgment rendered in this case.

The defendant contends that the true measure of damages under a collect on delivery contract is the actual loss sustained by the shipper because of the carrier's breach of duty. In this connection, in the second delivery of hogs

made to Arnold Brandt some became sick with cholera and died, and also from the shipment of hogs here involved, some became sick and died, necessitating expense on consignees' part because thereof; the hogs were of less value than the purchase price; that all such matters should be taken into consideration in determining the actual loss sustained by the shipper from the breach of the agreement by the carrier.

A carrier is liable ordinarily for the loss proximately resulting to the consignor by reason of the delivery of a c.o.d. shipment without collection of specified charges. However, the court recognizes the right of the shipper to recover the amount which the carrier is directed to collect as a condition of delivery if there is a reasonable probability that the collection would have been made if the carrier had done its duty. See Mogul Inc. v. Lavine Inc., *supra.*

The rule as stated in 13 C. J. S., Carriers, § 186, p. 386, is as follows: "For breach of a carrier's duty to carry and deliver, as bailee of a C. O. D. shipment, the carrier is liable, as in any other case of misdelivery, for the value of the goods; but for breach of its duty, under such a shipment, to act as collecting agent for the consignor, the carrier is liable for whatever could have been collected if such duty had been performed, * * *." Mogul Inc. v. Lavine Inc., *supra,* is cited in support of the rule.

The trial court, from the evidence, must have concluded that there was a reasonable probability that the defendant, through his driver Colson, could have made the collection of the entire purchase price of the hogs had Colson performed his duty. The trial court having so found, we see no reason to disturb this finding.

"The finding of a trial judge in a law action has the force of a verdict and will not be disturbed upon appeal unless clearly wrong." Quivey v. City of Mitchell, 133 Neb. 727, 277 N. W. 50; In re Estate of Johnson, 144 Neb. 372, 13 N. W. 2d 412.

We conclude that the findings of fact and judgment of

the trial court are not clearly wrong, and, under the circumstances, will not be disturbed.

For the reasons given in this opinion, the judgment of the trial court is affirmed.

AFFIRMED.